## Houston & T. C. R'y Co. v. Rust & Dinkins.

(Case No. 4150.)

1. CONSTITUTIONAL LAW. — The constitution of 1876, in regard to the transportation of freight by railway companies, left in force the common law rules affecting common carriers, as applicable to such companies, until the act of 1879, which was passed in obedience to article X, section 2, of that constitution.

2. RAILWAY COMPANIES — DISCRIMINATION IN CHARGES. — Railway companies, independent of the act of 1879, and before its enactment, were, in the transportation of freight, subject to the following rules:

1. They were held to the strictest impartiality in the conduct of their business,

in withholding all privileges or preferences from one customer which were not extended to all others.

2. But the above rule is subject to the qualification, that where a rate of freight is reasonable for all customers, contracts for a less rate might be made in special cases, when, under all the circumstances, the discrimination is reasonable and just.

3. The discrimination must not subject others to unreasonable disadvantages, nor must it be made in order to give one individual a preference to the disadvantage of another; or one to give preference and advantage to one locality to the prejudice of another locality.

4. A mere discrimination in favor of a customer was not unlawful unless it was an unjust discrimination.

3. SAME.— A charge which made the liability of a railway company depend on the single question of inequality of the rate of freight charged to plaintiff as compared with the rate charged to certain other specified persons, irrespective of any and all other facts of the case, *held* error.

ERROR from Travis.   Tried below before the Hon. E. B. Turner.

The questions involved will appear from the statement of the case and the agreed facts, as the same are made and presented in the brief of the appellants' counsel.   The statement of the case, and of the facts, are as follows:

Rust & Dinkins, plaintiffs in the court below, were, during the cotton shipping season of 1876–77, merchants and partners in the business of receiving, forwarding and dealing in cotton at Austin, Texas.

The defendant, the Houston & Texas Central Railway Company, is a common carrier over the line of its road, extending from Austin to Houston.

The Galveston, Houston & Henderson Railway Company is a common carrier over the line of its road, which extends from Houston to Galveston.

The Houston Direct Navigation Company is a common carrier, running a line of steamers between Houston and Galveston.

The rates of freight between Houston and Galveston over the two last-named lines of transportation were the same.

The Galveston, Houston & Henderson Railway Company entered into a contract with the plaintiffs, Rust & Dinkins, to allow them a rebate of ten cents a bale on all cotton shipped by plaintiffs over its line.

The Houston & Texas Central Railway Company undertook to carry cotton from Austin to Galveston, that is, beyond its own line, via the Houston Direct Navigation Company, at a rate of freight less, *i. e.*, at from $1.00 to $2.00 per bale, less than it would undertake to deliver the same freight in Galveston via the Galveston, Houston & Henderson Railroad.

The plaintiffs, Rust & Dinkins, availed themselves of the cheaper line, and forwarded their cotton to Galveston over the Houston & Texas Central Railway Company, and so by reason thereof lost their rebate of ten cents per bale promised them by the Galveston, Houston & Henderson Railway Company. They sued and recovered judgment for $54.60 on this count.

Counsel for appellant waived any complaint as respects the above item.

A further supposed cause of action was set up, which may be briefly stated thus: About the time of the alleged grievances, a war for the control of freights existed between the Houston & Texas Central Railway Company and the International & Great Northern Railway Company, which latter had just then reached Round Rock, in Williamson county. At this time there was no fixed tariff of rates. The rates were subject to daily changes to meet the competition existing. All rates were made with the patrons of the Houston & Texas Central Railway Company (including plaintiffs) from day to day, by special contracts below regular tariff rates.

During the existence of this warfare between the two railroads (the precise date is immaterial), the Houston & Texas Central Railway Company entered into a special contract with two merchants in Austin, by which it was agreed that these two merchants would ship and the company would carry a certain specified number of bales of cotton, viz., fifteen hundred bales, during the season, from Austin to Galveston, at a fixed rate of freight, viz., $2.00 per bale; this rate of freight to be paid by these merchants whether the rates on cotton from Austin to Galveston, by reason of the existing competition, would go higher or lower.

The Houston & Texas Central Railway Company made another contract about the same time with several merchants who resided and did business in Georgetown, Williamson county, Texas, a point beyond Round Rock, the termination of the International & Great Northern Railroad Company, whereby it was agreed that these merchants would ship all their cotton and freight by way of Austin and the Houston & Texas Central Railway to Galveston and New York at specified rates, the rate on cotton being fixed at $2.00 per bale from Austin to Galveston.

The Houston & Texas Central Railway Company had also a contract with one of these Austin merchants for a rebate of fifty cents per bale on all cotton shipped by him during the cotton season.

The contention and competition between the two railway companies came to an end before these contracts for transportation

made with the Georgetown merchants and the Austin merchants were executed. Upon a cessation of hostilities, rates from Austin to Galveston advanced, the tariff at one time being $3.50, and afterward at $4.25 per bale, which the plaintiffs, Rust & Dinkins, were required to pay; the excess over and above the contract price, $2.00 per bale, with the Georgetown and two Austin merchants being in some instances $1.50, and in some $2.25.

The plaintiffs allege that all freights on cotton shipped by them to Galveston during the fulfilment of said contracts over and above the rate fixed in said contracts were unlawfully extorted from them, and they brought this suit to recover back the amount paid by them in excess of $2.00 per bale.

The evidence showed that plaintiffs had, during the fulfilment of said contract, shipped so many bales of cotton as would, at the alleged excessive rates of $1.50 and $2.25 per bale, make the amount of the verdict and judgment, less the sum of $———, which is not now here questioned.

It only remains to be stated that the defendant company gave no notice to the public of an intended increase, or other notice or intimation to plaintiff or the public that such special contracts would be made with these two Austin merchants; and the agent of the company, when said contracts were made, enjoined secrecy as to its terms upon the parties with whom the contracts were made.

Plaintiffs were partners doing business in the city of Austin, Texas, in the manner and during the time alleged in their petition.

Defendant is a corporation doing and conducting a railroad from Austin city to Houston city, Texas, and doing business between said places as a public common carrier for hire.

That to reach their market with their merchandise, plaintiffs were compelled to employ the services of defendant, no other way being complete between said points.

That plaintiffs had a contract for rebate with the Galveston, Houston & Henderson Railroad as declared and detailed in their petition, and that "Exhibit B" is a true and detailed account, and amount of rebates to which plaintiffs would have been entitled in said contract, if, as they desired, they could have shipped their cotton from Houston to Galveston over said railroad.

That the usual and regular rates between Galveston and Houston over the Houston Direct Navigation Company and on the Galveston, Houston & Henderson Railroad Company were, during the course of said shipments, the same.

That plaintiffs desired to ship on the Galveston, Houston & Hen-

derson road the bales of cotton in "Exhibit B" mentioned, and did not do so because defendant refused to so forward the same, except at a rate $1.00 to $2.00 more than by way of the Houston Direct Navigation Company, as set out in the plaintiffs' petition.

The plaintiffs shipped and paid freight as alleged in their petition, on bales of cotton either belonging solely to themselves, or to themselves as owners by reason of advancements with power to ship and sell and deduct advances and expenses and account to their customers for balances, as set out in "Exhibits A and C," to an amount rendering the excesses over and above two dollars (and twenty-five cents) per bale, as therein stated, sufficient, in addition to the amounts stated in the charge by the court, as agreed upon, to make the amount of the verdict of the jury. The matters and items stated in the charge of the court were agreed upon as therein stated.

Plaintiffs also proved the remainder of the items in excess in "Exhibits A and C" in cotton shipped by plaintiffs as forwarders for the owners — the facts in reference thereto being that plaintiffs did not own or have any present interest in said cotton, but had authority from the owners to sue for and recover excesses paid by them in the course of their agency. Plaintiffs were paid for their services as forwarders, and repaid freights paid out before suit was instituted. In reference thereto plaintiffs' duty was to forward by the usual route by regular and usual rates.

During all the times of the shipments referred to in this suit, defendants were carrying cottons, by the bale, similar in all respects, and in which the defendant's duties and services were the same, from and to the same points, for parties who lived and did business in Georgetown, Williamson county, at the rate of $2.00 per bale, under the following contract:

"GEORGETOWN, TEXAS, September 28, 1876.

"We, the undersigned merchants of Georgetown, hereby agree and bind ourselves as honorable business men that we will ship all our cotton and freight via Austin, and H. & T. C. R. R., at the following rates, viz.:

"Cotton from Austin to Galveston, $2.00 per bale.

"Cotton from Austin to New York, $4.50 per bale, via Morgan.

"H. D. N. Co., freight, Galveston to Austin, fifty cents per one hundred pounds, all classes.

"H. D. N. Co., freight, New York to Austin, class 1, $1.00; class 2, 90 cents; class 3, 80 cents; class 4, 70 cents; via Morgan.

"This agreement to continue to January 1, 1877.

" The H. & T. C. R. R. Co. bind themselves to carry the freight and cotton at above rates.

> " F. L. PRICE & BRO.,
> " AMZI TAYLOR & CO.,
> " RUCKER & HODGES,
> " M. E. STEELE,
> " DAVID LOVE,
> " C. A. D. CLAMP,
> " G. D. HARRIS & CO.

" A. S. MAIR, West. Ag't for H. & T. C. R. R. Co."

A similar contract was made with the merchants doing business in Austin, by the terms of which the defendant company agreed to carry a specified number of bales, to wit, fifteen hundred bales, from Austin to Galveston at the rate named, whether the rates produced by competition should be above or below the price named in the contract; the facts being that the International & Great Northern Railroad Company, a rival and company, common carriers, was completed to Georgetown, and was competing for freight.

The said contract with the two Austin merchants was made at a time when all rates made with its patrons and customers, including the plaintiffs (by reason of the competition), were by special contract below regular tariff rates, made from day to day, and subject to daily changes to meet the competition with the International & Great Northern Railroad.

Afterwards the two companies agreed upon rates fixed upon, which the plaintiffs were compelled to pay, when the Austin merchants were having their cotton carried under their contract at a less rate than plaintiffs, and so continued to the extent of the number of bales named and specified in the contract was carried.

The defendant company gave no notice to the public that special contracts would be made as was made with these Austin merchants, and the agent of the defendant, when said contract was made, enjoined secrecy as to its terms with the parties with whom the contracts were made.

There was also a contract with one of these Austin merchants for a rebate of fifty cents per bale on all cotton shipped by him during the cotton season.

The leading question involved in the appeal is presented in the third ground assigned by the appellant as error, to wit: " The court erred in charging the jury that the defendant railway company cannot discriminate in the price of freights on cotton raised and produced at different points, without subjecting itself to the legal results

which follow such discrimination, and in stating erroneously in the charge what the legal results were, and in refusing, in connection therewith, to give the defendant's second charge prayed for."

The objectionable charge was as follows: "The next question to dispose of is, whether a railroad that receives goods at Austin, to be shipped to Galveston, can discriminate in the price of freight between cotton raised at different points, and I charge you that it cannot do so without subjecting itself to all the legal results which follow such discrimination. The plaintiffs claim that the defendants have so discriminated as against them, charging them more for the transportation of cotton from Austin to Galveston than they charged other persons during the same period of time. If you find this to be a fact from the evidence, then the question is as to the measure of damages. I charge you that the company was under obligations to carry for one man just as cheap as for another, and the excess charged to plaintiff, above that charged to other persons, if anything, during the same period, is the measure of damages, and what is called discrimination."

The defendant, in connection with this charge, asked the court to give this instruction, which was refused: "A railroad company may discriminate in the price of carriage and transportation of cotton and other freight, when such cotton and other freight would not really and in the ordinary course of traffic and transportation seek some other channel. It may discriminate in favor of certain localities in the price of freight or carriage, in order to attract to its line cotton and other produce which but for such discrimination it would lose the carriage of."

The appellant assigns as error the refusal to give the following instruction, among others: "Fifth. If a contract is made with a railroad company to carry cotton at certain figures, which at the time is not above the regular rates then charged all other persons, and the regular rates afterward go up, and persons are all charged higher rates than they were charged at the date of such contract, the company would be compelled to carry out their contract, and that would not constitute what would be called discrimination against a party."

Verdict and judgment for plaintiffs for $1,099.35.

*Geo. Goldthwaite*, for appellant.

Upon an examination of the authorities the following propositions must be deduced:

. I. The law imposes the duty upon common carriers to carry for reward for all persons, indiscriminately.

II. The reward demanded by the common carrier must be reasonable, and, when prescribed by statute, must be within the prescribed limits.

III. When the common carrier demands a greater reward than is reasonable for the service, or more than the rates prescribed by law, the party injured has, in this state, three remedial proceedings at his command:

1. He may proceed by civil action under the statute. Pasch. Dig., art. 453.

2. He may prosecute the common carrier, if a railway company, under the statute. Pasch. Dig., arts. 4929, 3375, 3378.

3. He may have his civil action at common law to recover the excess illegally demanded and paid.

IV. When a common carrier, for any reason satisfactory to himself, undertakes to carry for one individual for a less reward than is demanded of another, who is required to pay more, but no more than is reasonable and within the rates prescribed by law, the latter has no right of action against the common carrier by the mere fact that the carrier has carried for another for a smaller reward.

V. An individual cannot recover any portion of a reasonable charge made by a common carrier, fixed by established tariff and within legal limits, simply upon the ground that other individuals, in exceptional cases, have been charged a smaller reward for like carriage. Extortion, *i. e.*, an unreasonable charge in excess of customary rates, or in excess of legal rates, must be the gist of the action to recover the excess paid.

VI. When a carrier shows such a partiality or preference in favor of one or more individuals, by granting lower rates or other privileges not common to the public, whereby the preferred individuals may monopolize to the injury of other individuals or the public, when equality of charges is required by law, the parties injured may resort to the preventive remedy — injunction, or the state may proceed by information.

And to cover other cases that will be cited by counsel, we add:

VII. An executory contract made by a common carrier with an individual for deductions and rebates in his favor from the customary and established tariff rates, cannot be enforced in an action at law against the carrier, for the same reasons that injunction will lie in the last preceding proposition.

The principles of law contained in the above propositions are so thoroughly discussed in the cases cited, we will content ourselves with extracts from the opinions, with an occasional reference to the

arguments of the counsel on the winning side, and to the elementary books cited.

Hutchinson on Carriers, note to § 302, says: "The law as stated originally in the English notes to Coggs v. Bernard, 1 Smith's Leading Cases, 283, was that 'the sum charged must be no more than a reasonable remuneration to the carrier, and consequently not more to one, though a rival carrier, than to another for the same service.' But when this statement of the law was quoted in the argument of Baxendale v. Eastern Counties Railway, 4 Com. B. (N. S.), 63, Byles, J., said: 'I know of no common law reason why a carrier may not charge less than what is reasonable to one person, or even carry for him free of all charge.' In accordance with this suggestion the text of the English notes were altered so as to read, 'the hire charged must be no more than a reasonable remuneration to the carrier, though at common law there is no liability to carry at equal rates for all customers.'"

Counsel in printed argument discussed his propositions with review of authorities.

*Hancock & West,* also for appellant.

*Walton, Green & Hill,* for appellee.

I. We deny plaintiff in error's general proposition, that plaintiffs show no cause of action by their allegations and the evidence. Messenger v. Penn. R. R. Co., 8 Vroom, 531; Audenried v. Phila. & Read. R. R. Co., 68 Pa. St., 370 (380); Parker v. Gt. W. R. W. Co., 7 M. & G., 253 (*293); Pickford v. G. J. R. W. Co., 10 M. & W., 399; Edwards v. Same, 8 Eng. L. & Eq., 447; 1 Smith's Leading Cases, 261 (note *et seq.* to Coggs v. Bernard); Chitty on Con., 417a (old edition); 2 Add. on Con., § 1007; 2 Redf. on Railways, 1, 189, 190, 445 (2); 1 Hilliard on Torts, 40.

II. The rates charged plaintiffs by defendants were arbitrary, unreasonable and illegal to the extent of the recovery here complained of. Const. Tex., art. X, sec. 2 (R. S., art. 22); Pasch. Dig., art. 453; Munn v. Ill., 4 Otto, 113; Guy v. Mayor, Baltimore (U. S. S. C.), 1880; Cumberland Valley R. R. Co.'s Appeal, 62 Pa. St., 218 (230); McDuffie v. The P. & R. R. R. Co., 52 N. H., 430 (13 Am. Rep., 72); Messenger v. Penn. R. R. Co., 36 N. J. (7 Vroom), 407 (13 Am. Rep., 457); Same Case, N. J. Ct. Errors and Appeals, 8 Vroom, 531 (18 Am. Rep., 754); Vincent v. Chi. & Alt. R. R., 49 Ill., 33 (43); C., B. & Q. R. R. Co. v. Parks, 18 Ill., 460; Galena & C. U. R. R. Co. v. Raes, id., 488; People *ex rel.* Chi. & Alt. R. R. Co., 55 Ill., 95.

III. The contract between the Georgetown merchants and defendant was relevant to the issue, whether or not the rates charged plaintiffs were or were not more than reasonable, usual or legal rates for the service performed.   McDuffie v. P. & R. R. R., *supra;* Vincent v. Chi. & Alt. R. R. Co., *supra.*

IV. The portion of the charge of the court objected to, when read with the context, is a correct statement of the law of the case, and contains no error requiring reversal.   Davis v. Loftin, 6 Tex., 489 (500–1); Fowler v. Waller, 25 Tex., 701; Johnson v. Granger, 51 Tex., 45; also, 2 Redf. on Railways, 446 (3); Story on Bailments, § 508.

Walker, P. J. Com. App.— The charge of the court asserts the proposition that it is unlawful for a railroad company to discriminate in the rates charged as freight between shippers over its road, where the transportation involves the like service to the one as to the other, and where the said shippers are sending their freights over the road during the same period of time.   It likewise propounded the test whereby to ascertain and determine in what consisted the "*discrimination;*" which was defined, in effect, to consist of the single fact, without other qualification or exception, of charging a greater rate to the one person than to the other or others.   Equality and sameness of charge for transportation to all alike is held in the charge to be a legal obligation on the part of the railroad company, and deviation from that test to be a violation of it; and further, that the difference between the amounts so charged to the parties respectively furnishes the measure of damages to the party who has paid the higher price.

At the date of the transactions which originated this suit, no legislation had been had which affected or modified the common law rules applicable to the rights of a common carrier in respect to making contracts establishing rates of freight with its customers and patrons.   The leading American decisions which have in recent times passed upon the obligations of railway companies towards the public in their relation of common carriers have been uniform, we think, in maintaining, on principles of the common law, irrespective of statutes, that their duty lies in the strictest impartiality in the conduct of their business, and in withholding all privileges or preferences from one customer which are not extended to all.   See Hutchinson on Carriers, secs. 297–301, inclusive, and the cases there cited and discussed, and other authorities cited.

Pierce, in his treatise on the Law of Railroads, p. 498, deduces

from the cases decided the following propositions: "A railroad company being under a public obligation as a common carrier, and being in a certain sense a public agent in consequence of holding by delegation the power of eminent domain, is required to treat the public with equality and fairness. It cannot discriminate in the transportation of persons and merchandise, by giving special privileges to one which it denies to another (citing Sanford v. Catawissa, W. & E. R. Co., 24 Pa. St., 378; Audenried v. Phil. & R. R. R. Co., 68 Pa. St., 370; New England Express Co. v. Maine Cent. R. Co., 57 Me., 188; McDuffee v. Portland & R. R. Co., 52 N. H., 430; Chicago & N. W. R. Co. v. People, 56 Ill., 365), or by charging for the same service higher rates to some than to others (citing Messenger v. Penn. R. Co., 7 Vroom, 407; Cumberland Valley R. Co.'s Appeal, 62 Pa. St., 218, 230; Camblos v. Phil. & R. R. Co., 4 Brewster, 563, 622; Vincent v. Chicago & A. R. Co., 49 Ill., 33). This rule is not to be inexorably applied so as, provided the rate is reasonable for all, to exclude contracts for transportation at a less rate in special cases, where, under the circumstances, the discrimination appears reasonable" (citing Fitchburg R. Co. v. Gage, 12 Gray, 393; Sargent v. Boston & L. R. Co., 115 Mass., 416, 422; McDuffee v. Portland & R. R. Co., 52 N. H., 430, 451, 452; Eclipse Towboat Co. v. Pontchartrain R. Co., 24 La. Ann., 1.

Hutchinson, in his work on Carriers, sec. 302, in a note, shows that there is a difference of opinion upon the question whether by common law the common carrier was bound to charge the same rate for the same service to all parties; and he quotes from Byles, J., as follows: "I know of no common law reason why a carrier may not charge less than what is reasonable to one person, or even carry for him free of all charge." The question was considered in the Fitchburg Railroad Company v. Gage, 12 Gray, 393. The court said: "The principle derived from that source (the common law) is very plain and simple. It requires equal justice to all. But the equality which is to be observed in relation to the public, and to every individual, consists in the restricted right to charge, in each particular case of service, a reasonable compensation and no more. If the carrier confines himself to this, no wrong can be done and no cause afforded for complaint." The author, in the discussion contained in the note, shows the construction which English courts have placed upon the English railway and canal traffic act of 1854, in regard to preferences in the rates charged for carrying. That act has been interpreted to apply to preferences of that character, and construed not to prohibit just and reasonable discriminations in

that respect.  Certainly the rule of the common law is not more stringent against carriers than the act itself, which was passed in order to limit and restrict them in their dealings with the public.  In this connection we will quote some of the comments of the author made in the note: " Although the purpose of the act is to prevent, among other things, unreasonable discrimination in rates to the prejudice or disadvantage of particular individuals, it was not, it has been said, to relieve every person from all possible prejudice or disadvantage from any arrangement which might be made by the carrier, if the arrangement was for the benefit of the public at large, for the reasonable increase of the business and profits of the carrier, and was not entered into with a view to the advantage or preference of one party or disadvantage of the other. . . . So the courts will not interfere if the charge or arrangement will greatly promote the interest of the carrier without unreasonably prejudicing those who may desire to employ him, or will be beneficial to the community, though disadvantageous to particular individuals. . . . But though the court, when such a question is brought before it under the statute, it is said, will feel great reluctance in interfering with the carrier in the management of his own business, and his interest must be taken into the account, yet if the discrimination made by him subjects others to unreasonable disadvantages, it will interfere and enjoin the carrier from making such preferences.  And so it will if the object of the carrier is, not solely his own advantage, but also to give a preference to one individual to the disadvantage of another, or to one locality to the prejudice of another."  The author appends to this note a reference to several English reported cases, which see.

The rule applicable to the subject of discrimination or preferences given by railroad companies as to freight rates, as it is summarized by Mr. Pierce (quoted above), seems on reason and authority to be a just and correct statement of it, as it ought to be construed and held to apply under the principles of the common law.

Our constitution, adopted April 18, 1876, contains the following section under article X: " Railroads heretofore constructed, or that may hereafter be constructed in this state, are hereby declared public highways, and railroad companies common carriers.  The legislature shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this state; and shall from time to time pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on said railroads,

and enforce all such laws by adequate penalties." The legislature, in 1879, passed a law on the subjects contemplated by the foregoing provision of the constitution; but being enacted after the plaintiffs' cause of complaint occurred, does not require from us any discussion concerning it. The section of the act referred to (art. 4257, R. S.) provides, among other things, as follows: " And no unjust discrimination in the rates or charges for the transportation of any freight shall be made against any person or place on any railroad in this state; and it shall be *prima facie* evidence of an unjust discrimination for any railroad company to demand or receive from one person, firm or company, a greater compensation than from another for the transportation in this state of any freight of the same kind or class, in equal or greater quantities, for the same or a less distance, which *prima facie* evidence may be rebutted by competent testimony on part of such company, showing that the discrimination, if any, was not an unjust one. And the question, upon an issue as to whether any alleged discrimination is unjust or not, shall be a question of fact, to be tried and determined as any other issue of fact in a case."

The organic law, together with the legislation had upon the subject, though not affecting the rights of the parties by reason of their operation upon them, are here quoted and referred to, to show in this connection that the constitutional direction given to the law department of government, as well as the legislative mind, both coincide in defining the meaning of the term " discrimination," and in the meaning contemplated in the prohibition against " discrimination," with the general qualifications on the subject which we have pointed out as existing under decisions in America and in England. It is not *mere* discrimination that is rendered obnoxious and unlawful, but it is " *unjust* " discrimination. As to what shall constitute improper discrimination is not defined, nor attempted to be defined; it is a question of law and fact in the given case; and whether the discrimination be or not unlawful, must be ascertained by applying to the facts of the case the principles of the common law to the general policy of our statutory law governing carriers and railroads.

The test of liability submitted by the charge was confined to the single question of inequality in the rate of freight charged to the plaintiffs as compared with the rate charged to certain other specified persons, irrespective of any or all of the other facts of the case. In that the court erred. It ought to have been submitted to the jury to determine whether, under all the facts of the case, the defendant charged the plaintiffs a rate beyond what was reasonable,

and beyond the price which was exacted of the public generally at the times when the plaintiffs shipped their cotton on defendant's railroad. And, if, although the plaintiffs were not required to pay a higher rate than were the public generally, yet if the defendant had allowed to certain particular persons, or merchants in a certain particular locality, more advantageous terms than had been given to the public generally, or to the plaintiffs, it ought to have been submitted as an issue of fact for the jury to determine, whether (under appropriate instructions applicable to the subject), under all the evidence applicable to the question, such preference so given was a fair and legitimate one; one justified by the common law rule forbidding the carrier to give to one special privileges which it denies to another, but which at the same time does not exclude as forbidden contracts for transportation at a less rate in special cases, where, under the circumstances, the discrimination appears reasonable.

It does not become necessary to pass upon the correctness or not of the counter charges asked by the defendant and refused; it is sufficient that the charge of the court was erroneous and was calculated to mislead the jury under a wrong test of defendant's liability. On another trial, a charge properly applicable to the whole case can be given by the court under the law governing the case, and we deem it superfluous to pursue the investigation of this record any further.

We conclude that the judgment ought to be reversed and the cause remanded.

REVERSED AND REMANDED.

[Opinion adopted November 23, 1882.]