WESTERN UNION TELEGRAPH COMPANY v. CALL PUBLISHING COMPANY.

FILED MARCH 8, 1895.    No. 5603.

1. A telegraph company is a public carrier of intelligence, with rights and duties analogous to those of a public carrier of goods or passengers.

2. Telegraph Companies: REGULATION. Section 7, article 11, of our constitution limits the legislature in the regulation of telegraph companies to the correction of abuses and prevention of unjust discrimination.

3. ———: RATES: DISCRIMINATION. Not all discrimination in rates is unjust. In order to constitute an unjust discrimination there must be a difference in rates under substantially similar conditions as to service.

4. ———: ———: ———: WHEN PROHIBITED. Chapter 89a, Compiled Statutes, regulating telegraph companies, prohibits, first, all partiality or discrimination between patrons in the handling of business; second, all partiality or discrimination in rates for

similar services ; third, partiality or discrimination as to terms
of payment or delivery ; and fourth, all discrimination in favor
of persons transmitting dispatches to the greater distance.

5. ———: ———: ———. In so far as the act referred to forbids
unjust discrimination, and disregarding the penalties imposed
by the act, it merely declares principles recognized by the com-
mon law.

6. ———: ———: ———: WHAT CONSTITUTES. Either under the
common law or the statute a telegraph company must charge for
its services no more than a reasonable rate; under like condi-
tions it must render its services to all patrons on equal terms ;
and it must not so discriminate in its rates to different patrons
as to give one an undue preference over another.

7. ———: ———: ———: ———. It is not an undue preference to
make to one patron a less rate than to another, where there ex-
ist differences in conditions affecting the expense or difficulty of
performing the service, which fairly justify a difference in rates.

8. ———: ———: ———: ———: VERDICT AGAINST EVIDENCE.
Where it is shown that a difference in rates exists, but that there
is also a substantial difference in conditions affecting the diffi-
culty or expense of performing the service, no cause of action
arises without evidence to show that the difference in rates is
disproportionate to the difference in conditions. A jury cannot
be permitted to find such disproportion without evidence.

ERROR from the district court of Lancaster county.
Tried below before TIBBETS, J.

H. D. Estabrook and Harwood, Ames & Pettis, for
plaintiff in error, cited: Interstate Commerce Commission v.
Baltimore & O. R. Co., 43 Fed. Rep., 37; Bayles v. Kan-
sas P. R. Co., 40 Am. & Eng. R. Cases [Col.], 42; McNees
v. Missouri P. R. Co., 22 Mo. App., 224; Hays v. Pennsyl-
vania R. Co., 12 Fed. Rep., 309; Schofield v. Lake Shore
& M. S. R. Co., 43 O. St., 571; Lotspeich v. Central R. &
B. Co., 73 Ala., 306; Cleveland, C., C. & I. R. Co. v. Closser,
45 Am. & Eng. R. Cases [Ind.], 275; Johnson v. Pensa-
cola & P. R. Co., 16 Fla., 623; Leloup v. Port of Mobile,
127 U. S., 640; Wabash, St. L. & P. R. Co. v. Illinois, 118

U. S., 557; *Western Union Telegraph Co. v. Pendleton*, 122
U. S., 349.

*William Leese* and *John M. Stewart, contra*, cited, con-
tending the service performed for the two papers was simi-
lar: (*Manufacturers' & Jobbers' Union of Mankato v. Min-
neapolis & St. L. R. Co.*, 4 Int. Com. Rep., 79; *Boards of
Trade v. Chicago, M. & St. P. R. Co.*, 1 Int. Com. Rep.,
215; *Louisville & E. St. L. C. R. Co. v. Wilson*, 32 N. E.
Rep. [Ind.], 311. As to the measure of damages: *In re
Excessive Freight Rates on Food Products*, 4 Int. Com.
Rep., 74; note to *Long Island R. Co. v. Root*, 11 Am. St.
Rep., 647–655; *Chicago & A. R. Co. v. People*, 67 Ill., 11;
*Indianapolis, P. & C. R. Co. v. Rinard*, 46 Ind., 293; *Mc-
Duffee v. Portland & R. R. Co.*, 52 N. H., 430; *Cook v.
Chicago, R. I. & P. R. Co.*, 81 Ia., 551; *Hays v. Pennsyl-
vania R. Co.*, 12 Fed. Rep., 309; *Louisville & E. St. L.
C. R. Co. v. Wilson*, 32 N. E. Rep. [Ind.], 311; *Bur-
lington, C. R. & N. R. Co. v. Northwestern Fuel Co.*, 31
Fed. Rep., 652; *Samuels v. Louisville & N. R. Co.*, 31 Fed.
Rep., 57; *Scofield v. Lake Shore & M. S. R. Co.*, 43 O. St.,
571; *State v. Cincinnati, N. O. & T. P. R. Co.*, 47 O. St.,
130; *Connell v. Western Union Telegraph Co.*, 18 S. W.
Rep. [Mo.], 883.

Irvine, C.

The Call Publishing Company is a corporation publish-
ing a daily newspaper in the city of Lincoln. It brought
this suit against the Western Union Telegraph Company,
alleging that since July 1, 1888, it had been receiving from
the telegraph company the dispatches of the Associated
Press collected by that organization at Chicago and trans-
mitted daily from Chicago to Lincoln as well as to other
cities; that there existed between the Associated Press and
the telegraph company a contract which prevented the Call
Company from procuring its news otherwise than over the

lines of the telegraph company; that during said period
the telegraph company had charged and collected from the
Call Company $75 per month for transmitting such dis-
patches, not exceeding 1,500 words each day; that the State
Journal Company published in the city of Lincoln a daily
newspaper which had been during the whole of such period
and prior thereto receiving the same dispatches; that dur-
ing the whole of said period the telegraph company un-
justly discriminated in favor of the State Journal Com-
pany and against the Call Company, and gave to the State
Journal Company an undue advantage, in that it charged
the State Journal Company for the same, like, and con-
temporaneous services as were rendered to the Call Com-
pany only the sum of $1.50 per hundred words daily per
month; that the amount charged and collected by the tele-
graph company from the Call Company was excessive and
unjust to the amount of the excess of the charge to it over
that to the State Journal Company; that immediately
upon discovering such discrimination, the Call Company
demanded repayment of such excess, which was refused.
Damages were alleged on this account in the sum of
$1,962, for which judgment was prayed. The telegraph
company admitted the charges made to the Call Com-
pany and admitted that it charged the State Journal
Company for its dispatches $125 per month, but denied
that it had given the State Journal Company any undue
advantage or that it had unjustly discriminated in favor of
the State Journal Company. It further alleged that the
Call Company published an evening paper, and received
over the telegraph company's lines dispatches not exceeding
1,500 words per day, all transmitted and delivered in the
day-time, and that this charge was fair and reasonable and
was no greater than was charged other persons for similar
services. It further alleged that it had accepted the pro-
visions of the act of congress of 1866, in regard to tele-
graph companies, and pleaded that the subject-matter of the

action was within the exclusive jurisdiction of the federal
courts; and it further pleaded that it at all times had been
ready to transmit all dispatches with impartiality in the or-
der in which they were received, and had ever been willing
to offer the same and equal facilities to the plaintiff and all
publishers of newspapers, and to furnish dispatches for pub-
lication to all newspapers on the same conditions as to pay-
ment and delivery.   The reply was a general denial.   There
was a verdict for the plaintiff for $975, upon which judg-
ment was rendered, and the telegraph company prosecutes
error.

The errors assigned relate to the instructions given and
refused, and to the sufficiency of the evidence.   The as-
signments of error in regard to the instructions group them-
selves in the same manner as in the case of *Hiatt v. Kinkaid*,
40 Neb., 178.   One assignment is directed against the in-
structions given by the court *en masse*.   Another is di-
rected against those asked by the telegraph company and
refused.   Some of those given by the court were manifestly
correct, and at least one asked by the telegraph company
was substantially covered by the court's charge.   These as-
signments must, therefore, be overruled, and we are remitted
in an examination of the case to a consideration of the suffi-
ciency of the evidence.

The evidence shows, without substantial conflict, that
prior to July, 1888, a newspaper had been published in the
city of Lincoln known as the *State Democrat*.   This paper
had acquired what is styled a "franchise" in the North-
western Associated Press, and had been receiving the dis-
patches of that organization, paying to the Associated Press
$20 per month therefor, and paying to the telegraph com-
pany for transmitting and delivering the dispatches $75 per
month for a maximum of 1,400 words per day.   The man-
ner in which this contract was brought about was that Mr.
Calhoun, the proprietor of the *State Democrat*, negotiated
with the manager of the press association for procuring its

news, and was by that manager informed that he should first make terms with the telegraph company for transmitting the messages. Negotiations were entered into between Mr. Calhoun and the telegraph company, resulting in an offer by the telegraph company to transmit 1,400 words per day for $75 per month, and this offer was accepted by Mr. Calhoun. About July 1, 1888, Mr. Calhoun sold his paper to the Call Company, and assigned to that company the franchise which he had acquired in the Northwestern Associated Press. No new contract is disclosed between the Call Company and telegraph company, but the telegraph company continued to deliver and the *Call* to receive the dispatches in the same manner as they had been transmitted and received to and by the *Democrat* before the sale, and the Call Company paid the rate of $75 per month. The paper published by the Call Company was an evening paper published between 3 and 4 o'clock in the afternoon.

The State Journal Company published a morning paper. It was also a member of the Associated Press and received over the wires of the telegraph company dispatches not to exceed 5,600 words a day, for which it paid, during this period, the sum of $125 per month. It also was a member of the United Press, another association for the collection of news, and received through that association over the wires of the Postal Telegraph Company from 7,500 to 8,000 words per day, for which it paid to the Postal Company $200.

The Associated Press transmits its news in two groups, called "reports." The day report is transmitted between 11 A. M. and about 2:30 P. M., and is for the especial benefit of evening papers. It is this report which the Call Company received. The night report is usually transmitted at night and generally between 7 P. M. and 3 A. M., and is for the especial benefit of morning papers. The Journal Company's contract strictly included only the night report, but for many years it has in fact received

both day and night reports.   Prior to the acquisition by
the *Democrat* of its franchise in the Associated Press the
day report to the *Journal* was relayed at Omaha, whence it
was usually transmitted to Lincoln by wire, but sometimes
by mail.   The Journal Company sent to the office of the
telegraph company for this report, and usually obtained it
about 4 P. M.   After the *Democrat's* acquisition of the
franchise the day report was transmitted from Chicago di-
rectly, except when the weather or other influences required
a relay at Omaha.   It was sent in time for use by the after-
noon paper, was committed to writing on manifold paper,
one copy delivered to the *Democrat,* and after its sale, to
the *Call,* and the other to the *Journal.*   The *Journal* was
not permitted to use this report until after it had been pub-
lished in the *Call.*   It was also shown that in order to be
of any service to the *Call* the day report must be delivered
to it not later than 3 o'clock in the afternoon, while the
night report to the *Journal* might be transmitted at any
time prior to about 3 o'clock in the morning.   Prior to the
contract between the *Democrat* and the telegraph company
for the day report, the telegraph company used but one
wire between Omaha and Lincoln.   In order to promptly
transmit the day report to the *Democrat* the telegraph com-
pany was required to erect another wire and to employ an ad-
ditional operator at Lincoln.   Neither this wire nor this op-
erator was employed exclusively for transmitting the report.
Other business between the two cities demanded additional
facilities, and this wire and this operator, when not engaged
in transmitting the press report, were used for commercial
business.   But the necessity of transmitting this report
was one of the elements, and evidently a large one, in re-
quiring the telegraph company to so increase its facilities.
During the hours within which the day report must be
transmitted the facilities of the telegraph company are
taxed with a great burden of commercial business, and
during those hours certain wires are leased to individuals

to accommodate their business. After 4 o'clock in the afternoon these leased wires are free and can be used by the telegraph company for other purposes. During the night when the night report is transmitted not only are these leased wires free for use by the telegraph company, but there is not the same pressure of commercial business generally, and it is the established usage of telegraph companies, on account of these circumstances, to transmit messages during the night at less rates than in the day-time. There is also evidence tending to show that there were more morning papers to divide the aggregate cost of transmitting the night report than there were evening papers to divide the aggregate cost of transmitting the day report.

There was some question made as to whether or not the *Call* and the *Journal* were in any sense competitors in such a way that either could be affected by the relative rates charged. On this point we have no doubt that a state of competition was shown. One was a morning paper, the other an evening paper, and the same persons frequently buy or subscribe to both; but it was shown that the advertising rates of a newspaper depend chiefly upon its circulation, and that its circulation depends largely upon its ability to supply the news to its patrons. That a paper with good facilities for obtaining and publishing the news will, other things being equal, exceed in circulation a paper with poorer facilities; and that these influences operate upon newspapers having the same field of circulation, although one be published in the morning and the other in the evening Indeed it would hardly require evidence to establish such patent facts.

From the foregoing statement of the evidence it will be seen that the following propositions were established: First—That the actual rate charged to the *Call* was much greater than the actual rate charged to the *Journal*. Second—That the two papers were in such sense competitors, that if one, for a given sum, could not obtain the same news

facilities as the other for the same sum, the difference would operate to the disadvantage of the former. Third—That from the requirements of the two papers, based upon their respective hours of publication, there was a marked and substantial difference in conditions affecting the convenience and expense to the telegraph company in transmitting to each its dispatches. Fourth—That there was no evidence of any character showing to what extent this difference in conditions affected the telegraph company. There was no evidence tending to show that the charge to the Call Company was in itself unreasonably high, that the charge to the Journal Company was unreasonably low, or that the charge to either was greater or less than the ordinary or reasonable charge to others for similar services. It follows, therefore, that the verdict was sustained by the evidence if, as a matter of law, it was sufficient to show either that another person was obtaining dispatches for a less sum than the plaintiff without regard to differences in conditions, or if it was sufficient to show a difference in rate accompanied by a difference in conditions, leaving to the jury, without other evidence, the duty of comparing the difference in rates with the difference in conditions and determining without other aid whether or not the difference in rates was disproportionate to the difference in conditions. But the verdict was not sustained by the evidence if a mere difference in rates without regard to conditions was insufficient to ground a right of action, or, a difference both in rates and conditions being shown, it was also necessary to establish by evidence that these differences were disproportionate.

The action was evidently begun under section 8 of chapter 89a, Compiled Statutes, providing that "it shall be unlawful for any telegraph company, association, or organization engaged in the business of forwarding dispatches by telegraph to demand, collect, or receive from any publisher or proprietor of a newspaper any greater sum for a given service than it demands, charges, or collects from the publisher or

proprietor of any other newspaper for a like service,  *  *
and  *  *  *  such telegraph company or association
shall be liable for all damages sustained by the person or
parties in consequence of such discrimination." Our con-
stitution contains an express grant of authority to legislate
upon this subject.   Article 11, section 7, of the constitu-
tion is as follows: "The legislature shall pass laws to cor-
rect abuses and prevent unjust discrimination and extortion
in all charges of express, telegraph, and railroad companies
in this state, and enforce such laws by adequate penalties to
the extent, if necessary for that purpose, of forfeiture of their
property and franchises." In the absence of such a provision
in a state constitution there could be little doubt of the power
of the legislature in the premises.   But *expressio unius est
exclusio alterius,* and the constitution containing this express
grant of power the provision quoted must be taken as es-
tablishing the limits of legislative authority upon this sub-
ject.   We refer to the constitutional provision because it
simply grants the right to prevent by legislation "unjust
discrimination."   This phrase has been frequently used by
the courts and legislatures and has obtained a well settled
construction.   It is not every discrimination which is un-
just.   So many cases illustrate this principle that it would
be difficult to collate them.   But the general nature of the
decisions may be readily seen from an examination of the
note to *Root v. Long Island R. Co.,* 11 Am. St. Rep. [N.Y.],
643.   In construing our statute it is necessary to bear in
mind the constitutional limitation quoted, and the statute
bears a just and reasonable construction within that limita-
tion.   It provides in its fifth section that all telegraph com-
panies shall transmit all dispatches with impartiality in the
order in which they are received, and use due diligence in
their delivery without discrimination as to any person or
party to whom they may be directed.   This section evi-
dently refers to the duty of the telegraph company as to
the mode of conducting its business and not to the charges

therefor, and forbids partiality or discrimination in the transmission of messages. Section 7 is very similar in its terms to what is known "as the long and short haul clause" of the interstate commerce act, and forbids the charging of a greater sum for the transmission of a message over a given distance than it charges for a similar message over a greater distance, but adds this significant proviso: "That dispatches transmitted during the night and dispatches for publication in newspapers may be forwarded and delivered at reduced rates; such rates must, however, be uniform to all patrons for the same service." Section 8 we have already quoted so far as it is material. Section 9 provides: "Every telegraph company and every press association engaged in the transmission, collection, distribution, or publication of dispatches shall afford the same and equal facilities to all publishers of newspapers, and furnish the dispatches, collected by them for publication in any given locality, to all newspapers there published, on the same conditions as to payment and delivery."

An analysis of these provisions discloses that the legislature sought, by the act referred to, to prohibit, first, all partiality or discrimination between patrons in the handling of business; second, all partiality or discrimination in regard to rates for similar services; third, all such partiality or discrimination as to terms of payment or delivery; and fourth, all discrimination in favor of persons transmitting dispatches to the greater distance. Without violence to the language of the act, and without giving it an interpretation beyond the constitutional grant of power, it cannot be construed so as to require a telegraph company to transmit messages to two patrons under different conditions at the same rate. So interpreted we do not think that the act, in so far as it affects civil actions, and disregarding the penalties it imposes, is anything more than declaratory of the common law. In the present state of civilization it would be idle to assert that a telegraph company is not charged

with a public function.  The telegraph company in this case does not so assert.  It is now the established law that a telegraph company is a public carrier of intelligence, with rights and duties analogous to those of a public carrier of goods or passengers.  The law regulating the duties of railroads and other carriers is, therefore, largely applicable to telegraph companies.  The act of congress known as the "Interstate Commerce Act" contains few new features and was chiefly designed to carry into the statutes of the United States (the United States as such not having any common law) the principles of the common law already enforced by the states in their domestic affairs.  England and many of the states have adopted similar statutes, not so much to engraft new principles upon the law as to make certain and more readily enforce principles already established.

It is argued by the telegraph company that no cause of action can be predicated upon the mere fact that another patron obtained services for a lesser rate, unless it be shown that the rate charged the complainant is in itself unreasonable and excessive.  There are cases to this effect, but we cannot lend our assent either to their reasoning or to their conclusion.  On the contrary, we believe the true rule to be that rates must not only be reasonable in themselves, but must be relatively reasonable; that is, that a person or corporation engaged in public business, and obligated to render its services to all persons having occasion to avail themselves thereof, is bound, in fixing its rates, to observe two rules: First, its rates must be reasonable, and second, it must not, without a just and reasonable ground for discrimination, render to one patron services at a less rate than it renders to another, where such discrimination operates to the disadvantage of that other. (*Board of Trade v. Chicago, M. & St. P. R. Co.*, 1 Int. Com. Rep., 215; *Hays v. Pennsylvania R. Co.*, 12 Fed. Rep., 309; *Scofield v. Lake Shore & M. S. R. Co.*, 43 O. St., 571; *Chicago & A. R.*

*Co. v. People*, 67 Ill., 11; *Indianapolis, D. & S. R. Co. v.
Ervin*, 118 Ill., 250; *Messenger v. Pennsylvania R. Co.,*
36 N. J. Law, 407; *Atwater v. Delaware, L. & W. R. Co.,*
48 N. J. Law, 55; *McDuffee v. Portland & R. R. Co.*, 52 N.
H., 430; *Houston & T. C. R. Co. v. Rust*, 58 Tex., 98;
*Ragan v. Aiken*, 9 Lea [Tenn.], 609.) But it is not un-
just discrimination, it is not contrary to the common law,
and it is not contrary to our statutes to make a difference
in rates where the expense or difficulty of performing the
services renders such discrimination fair and reasonable.
Many of the cases already cited illustrate this principle.
In addition thereto there may be cited *Interstate Commerce
Commission v. Baltimore & O. R. Co.*, 43 Fed. Rep., 37;
*Bayles v. Kansas P. R. Co.*, 13 Col., 181; *Root v. Long
Island R. Co., supra*; *Savitz v. Ohio & M. R. Co.*, 49 Ill.
App., 315, 37 N. E. Rep., 235. With the general rule
announced in the latter cases we concur, but we do not
wish to commit ourselves to its application in all of them.
Some cases justify a discrimination merely on account of the
quantity of business transacted. In the language of *Hays
v. Pennsylvania R. Co.* and *Scofield v. Lake Shore & M. S.
R. Co., supra*, such discrimination in favor of the patron
having the larger business tends to create monopoly, destroy
competition, and is contrary to public policy. The same
objection can be urged to the giving of privileged rates for
the purpose of obtaining the business of a particular
patron, and a discrimination on this ground is, we think,
very justly condemned by the house of lords in the case
of *London & N. W. R. Co. v. Evershed*, L. R., 3 App.
Cases [Eng.], 1029. Many of the cases cited construe
statutes, but they were statutes declaring what we think to
be common law rules, so that whether this case be viewed
as one under our statutes relating to telegraph companies,
or one based upon the common law, we think the princi-
ples governing it are the same. These are that the tele-
graph company was bound, first, to charge for services no

more than what was reasonable; second, that under like conditions it must render services to all patrons on equal terms; third, that it must not so discriminate in its rates to different patrons as to give one an undue preference over another; but fourth, it is not an undue preference to make to one patron a less rate than to another when there exist differences in conditions as to the expense or difficulty of the services rendered which fairly justify such a difference in rates.

As we have already stated, a considerable difference in the absolute rate charged the Call Company and the Journal Company was shown, but there were also shown a difference in conditions affecting the expense and difficulty of rendering the services which at common law would justify some difference in rates, and this difference was one which the proviso quoted from the seventh section of our statute expressly recognizes as justifying a discrimination in this state. There was no evidence to show that the rate charged the Call Company was unreasonably high. There was no evidence to show that the rate charged the Journal Company was unreasonably low. There was no evidence to show what difference in rates was demanded or justified by the exigencies of the differences in conditions of service. We do not think that the enforcement of contracts deliberately entered into should be put to the hazard of a mere conjecture by a jury without evidence upon which to base its verdict. How can it be said that a jury acts upon the evidence and reaches a verdict solely upon consideration thereof when, having established a difference in rates and a difference in conditions, without anything to show how one difference affects the other, or to what extent, it is permitted to measure one against the other, and to say that to the extent of one dollar or to the extent of one thousand dollars the difference in rates was disproportionate to the difference in conditions? It may be said that it would be difficult to produce evidence to show to what extent such

differences in conditions reasonably affect rates. This may be true, but the answer is that whatever may be the difficulties of the proof a verdict must be based upon the proof and a verdict must be founded upon evidence and not upon the conjecture of the jury, or its general judgment as to what is fair without evidence whereon to found such judgment.

The chief justice takes a different view, and thinks there is found in the evidence a basis for the verdict. This conclusion is arrived at by considering the service performed for the *Journal* so far as the day report is concerned as similar in its conditions to that performed for the *Call*. We agree with him that it is the fair inference from the evidence of the witness Hathaway that the sum of $125 per month paid by the *Journal* is intended to include compensation for both day and night reports, but we do not think that any basis of comparison is thus afforded. The chief justice argues that because the day report is now taken from the wires on manifold paper and one copy given to the *Call* and the other to the *Journal*, the conditions of service as to this report are the same. In this we think there is overlooked the fact that it is only on account of the *Call's* contract that the telegraph company is required to deliver the report to either paper at the time or in the manner in which it is now delivered. At the risk of some repetition we shall point out what are conceived to be the differences in the conditions affecting the two papers. Before the *Call*, or rather its predecessor, the *Democrat*, began to take the report, the day report was delivered to the *Journal* at the convenience of the telegraph company. The *Journal* had no contract requiring the delivery of this report at any particular time. This is shown by the testimony both of Mr. Calhoun and Mr. Horton. The *Journal* makes use of this day report only to assist it in editing the night report, and did not then have, nor has it now, any use for the day report until evening. Indeed, now that

there is an evening paper in Lincoln, for the purposes of the *Journal* it might wait until the *Call* appeared and use the dispatches published in that paper, without depending upon the telegraph company at all. Under the former conditions, therefore, commercial business was given the right of way on the wires and the day report was transmitted during lulls in the commercial business, without any requirement that it should go to Lincoln before evening. In taking advantage of this right to give commercial business the preference there was then a delay of several hours at Omaha. According to the testimony on behalf of both parties the day report is of no use to the *Call* unless it is all received by 3 o'clock, or within a few minutes thereafter, and this report now has the right of way during the hours of its transmission as against commercial business. In order to accommodate this business the telegraph company was compelled to increase its facilities between Omaha and Lincoln. The evidence is undisputed upon this. Mr. Horton says in answer to a question as to what the telegraph company did to enable it to transmit the day report:

I put up an additional wire between Omaha and Lincoln over the Missouri Pacific railway. We had to employ an additional operator at Lincoln to take the afternoon report. A portion of his time, of course, was utilized in other business.

Q. What portion of the time was devoted to this exclusively?

A. From 11 o'clock to 3:30.

Q. How much was his salary per month?

A. Sixty dollars.

On cross-examination the same witness was asked whether it was not the growth of commercial business that made it necessary to put in a new wire for this report. His answer was, "That was partly it, certainly. We would not have built a wire on purpose to accommodate one newspaper at $75 a month." From this we think it ap-

pears not that the wire was erected chiefly on account of the commercial business, but that it was the necessity of supplying the day report to the *Call* which was the immediate cause of erecting the wire. Under the old conditions the *Journal* paid the same rate which it does now for its report. Those conditions were then, and are now, sufficient for the purposes of the *Journal*. The fact that it now gets the day report on manifold paper as early as the *Call* is a matter of no consequence to the *Journal*, as it is not allowed to use the report until after the *Call* is published. Both Mr. Cox and Mr. Calhoun testify to this. To hold that the conditions are now similar and that the *Journal* and *Call* must have the same rate would require either that the telegraph company make its rate for the increased service as low as it was for the former service, or else that it increase the rate charged the *Journal*, although the *Journal* is in nowise interested in the increase of service. We think, therefore, that the conditions of service which the *Call* requires and which the *Journal* requires are so different as to leave no basis for comparison.

REVERSED AND REMANDED.

NORVAL, C. J., dissenting.

I do not concur in the conclusion reached by Commissioner IRVINE, that there is no evidence in the bill of exceptions to sustain the verdict and judgment. The record shows without controversy that for nearly three years prior to the bringing of this action the Call Company paid the telegraph company the sum of $75 per month for transmitting in the day-time the dispatches or reports of the Associated Press containing not exceeding 1,500 words each day, and during this period manifold copies of the dispatches were likewise delivered by the telegraph company to the State Journal Company, and the last named company also, in addition to said day reports, received each

night from the Associated Press over the wires of the tele-graph company dispatches not exceeding 6,500 words; that the State Journal Company paid for transmitting the dispatches received by it during said time the sum of $125 per month, and no more. Whether the last named sum was paid for both the day and night reports or messages, or for night reports alone, the evidence is conflicting.

Mr. C. B. Horton, the assistant superintendent of the telegraph company, in his testimony says no compensation was received for transmitting the day messages, but the sum of $125 was paid for the night dispatches alone; that no charge was made for the day reports, but the same were furnished the State Journal Company without compensa-tion, as a mere gratuity.

Mr. J. D. Calhoun testified that the State Journal Com-pany paid $125 for the transmission of both the day and night reports received by it.

Mr. H. D. Hathaway, the manager of the State Journal Company, being interrogated while upon the witness stand whether anything was paid for the day reports, answered: "No, sir; except as we paid—it might be included in the whole arrangement."

The fair inference to be drawn from the testimony of the last named witness is that no specified amount was col-lected for the day reports alone, but that the sum collected —$125 per month—was for both reports. The record discloses that the usual rate charged for night reports or messages is four times less than that paid for sending the day reports of the same number of words. This being true, it is not reasonable to suppose that the State Journal Company would pay $125 per month for the night dis-patches merely, when the Call Company was paying $75 per month for the day reports received by it. According to the customary difference between the day and night rates, the State Journal Company, if we adopt as a basis the sum the Call Company was charged for its dispatches, should

have paid but $75 per month, had the night reports con-
tained 6,000 words each, instead of paying $125 per month
for the transmission of dispatches of 5,600 words each, as
is claimed by the telegraph company. In my view the
plaintiff was entitled to a verdict for some amount whether
the State Journal Company paid $125 for both the day
and night dispatches or for the night reports alone. If, as
contended by the telegraph company, nothing was charged
the State Journal Company for the day reports, and the
evidence before the jury was sufficient to authorize them
in so finding, then it is patent that the plaintiff in error
did not render the services to the Call Company on the
same terms it did to another patron, but unjustly and un-
lawfully discriminated in its rates against the defendant in
error. The evidence shows that the State Journal Com-
pany had been receiving the day reports of the Associated
Press for a long time prior to the date the Call Company
commenced taking them, and no additional trouble, costs,
and expense were incurred by the telegraph company in
furnishing the reports to the defendant in error, inasmuch
as the day reports were taken off the wires on manifold
paper and one copy thereof was delivered to the State Jour-
nal Company and the other copy to the defendant in error.
It is true that after the Call Company began taking the dis-
patches the plaintiff in error put up another wire between
Lincoln and Omaha, but the evidence shows that this was
done chiefly to provide additional facilities for taking care
of the rapid increase of its commercial business. Prior to
the time the *Democrat*, the predecessor of the *Call,* com-
menced taking the dispatches the day reports were usually
delivered to the Journal Company about 4 o'clock in the
afternoon, which was no later than they are now received.
These reports were sometimes forwarded to the Journal
Company by mail, but the common practice, as well as the
most convenient mode for the telegraph company, was
to send them over the wire. Now there is no relay at

Omaha, but the day reports are received at Lincoln at the same time as in Omaha, but, so far as the proofs show, the trouble and expense to the telegraph company was not increased by the change but lessened.   That formerly it was under no contract to deliver the day reports at a particular hour is unimportant, inasmuch as the fact remains that there has been no substantial change in the time of delivery since the contract with the publishers of the *Democrat* was made.   Nor is it material that the *Call* is an evening paper and the *Journal* is published in the morning, and that the latter has no use for the day report until late in the afternoon or night.   There is a total lack of evidence to show that these facts, or any of them, in the least affected the expense or difficulty of performing the service.

It also appears by the testimony of Mr. Cox, one of the proprietors of the *Call*, and Mr. Calhoun, formerly managing editor of the *Journal*, that the day dispatches appear regularly and in full in the last named paper.   It is said, however, that the Journal Company, without any extra cost to it, might have taken the dispatches from the *Call* instead of depending upon the telegraph company.   This could have been done only to the extent the *Call* uses them.  Mr. Cox testifies, and it is undisputed, that the *Call* did not always contain the full report, or even half of it.  Sometimes it is received too late for use in the evening paper.   We have not overlooked the fact that the *Call* contract contains a clause to the effect that the telegraph company should not deliver the day report to any other paper in Lincoln until after the *Call* goes to press.   This provision is of no validity.   A telegraph company is a common carrier and must treat all persons alike.   It cannot discriminate against its patrons, or give one paper a monopoly of the Associated Press dispatches.   It could no more do that than a railroad company could contract with A to carry his stock from Lincoln to South Omaha and

provide therein that the stock of B, consigned to the same place and carried on the same train, shall not be delivered until A's stock has been delivered and sold. Again, the stipulation in the *Call* contract did not affect the Journal Company, for the reason that the latter had no use for the day report until in the evening. We are convinced that the services rendered the defendant in error and the State Journal Company, as to the day dispatches, were under like conditions as to costs and expense; therefore, upon the testimony of Mr. Horton alone, the plaintiff was entitled to recover. The rule is where a telegraph company charges one person a higher rate than it exacts from another for the transmission of dispatches under like conditions, the difference between the charges is the measure of damages the one who has been discriminated against is entitled to recover. (*Cook v. Chicago, R. I. & P. R. Co.*, 81 Ia., 551; *Scofield v. Lake Shore & M. S. R. Co.*, 43 O. St., 571; *Louisville & E. St. L. C. R. Co. v. Wilson*, 32 N. E. Rep. [Ind.], 311; *Hays v. Pennsylvania R. Co.*, 12 Fed. Rep., 309; *Samuels v. Louisville & N. R. Co.*, 31 Fed. Rep., 57.) The plaintiff below was entitled to a verdict, even though the State Journal Company paid $125 per month for both the day and night reports.

It will be observed that the Call Company was required to pay for the transmission of its dispatches at the rate of $5 per month for each one hundred words, while the State Journal was charged for the messages received by it a little over $1.76 per month per hundred words. There is no room for doubt that this difference in rates would constitute unjust discrimination against the Call Company, for which it would be entitled to recover the difference between the amount paid by it and the more favorable rates granted the State Journal Company were it not for the fact that all the messages to the two companies were not transmitted by the plaintiff in error under like conditions as to service. What were the differences in conditions which affected the

cost or expense of the transmission of the messages? The day reports, as we have already seen, were sent to each of the two patrons under practically similar conditions and at the same time. As to the day reports, as we have seen, there could be no difference in the costs or expense of the service. The night and day messages or reports were transmitted under conditions materially different. It was shown that such differences in conditions necessarily made the tolls charged for the night reports less than the rates received for the service rendered in transmitting the day messages of the same number of words. I do not agree with my associates that there was no evidence of any character showing to what extent the difference in conditions affected the telegraph company. On the contrary, I am fully persuaded that there is such evidence in the record and that it shows the difference in the rates charged was not proportionate to the difference in the conditions which affected the expense of performing the service.

Mr. C. B. Horton, the witness already mentioned, testified upon this branch of the case as follows:

Q. What, if any, difference is there in the case of operating or handling news at night and during the day—what difference in cost and in the convenience? State wherein it is.

A. In the day-time, as everybody knows, our wires are loaded with important business, board of trade grain messages, and we have wires leased during those hours and they are filled and occupied. At night we have idle wires and we utilize them. A lower rate has always been made in the night service. On press reports it is about one to four, one of day to four at night.

Q. One word at day to four at night?

A. Yes, sir; I believe that is the rule in all of our contracts.

Q. Whether it is by the word or by the job?

A. Yes, sir.

The foregoing evidence was sufficient to authorize the jury in finding the difference in rates between the day and night reports. The Call Company should not have been charged more than four times the rates charged for the night messages. The difference between the rates paid and the tolls which should have been charged for service rendered the defendant in error was fully established by the evidence. It paid $5 for each one hundred words daily per month, when the rate should have been not exceeding $4. There was, therefore, an unjust discrimination of $1 per hundred words per month, which amounted to $15 per month. This sum was overpaid each month for thirty-four months, making an aggregate of $510, to which should be added interest at seven per cent on each payment from the date thereof until the rendition of the judgment in the court below, amounting to $83.30. So under this view of the case the Call Company was entitled to a verdict for at least the sum of $593.30, while if as the telegraph company contends, and there is some evidence in the record tending to show that the Journal Company paid nothing for the day reports, the verdict is none too large. The judgment should be affirmed, or at least it should be allowed to stand upon the defendant in error entering a remittitur for the amount the verdict is in excess of $593.30.