160 N.W.2d 223 (1968)
183 Neb. 398
R. K. RUTHERFORD; Nebraska Investment Company, a Nebraska Corporation, Appellants,
v.
The CITY OF OMAHA, a Municipal Corporation et al., Appellees,
Oddo's Drive In, Inc., a Nebraska Corporation, Intervener-Appellant.
No. 36750.
Supreme Court of Nebraska.
July 19, 1968.
*224 Ross & O'Connor, Omaha, for appellants and intervener-appellant.
Herbert Fitle, City Atty., Edward M. Stein, Edward A. Mullery, Omaha, for appellees.
Heard before WHITE, C. J., and CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN and NEWTON, JJ.
SMITH, Justice.
Plaintiffs' and intervener's petitions concerning sewer use charges made by the City of Omaha were dismissed after trial. Plaintiffs and intervener have appealed. Their contentions are: (1) The rates and *225 charges were unjustly discriminatory. The city unduly preferred (a) the class of commercial and industrial users to the class of residential users, and (b) the large residential user and the large industrial user to the small commercial user. (2) The city imposed unenforceable special assessments and penalties, not sewer use charges.
Land use in Omaha in 1960 was 6 percent commercial, 42 percent residential, and 10 percent industrial. The industrial class numbered 12 members with individual water consumption in excess of 1,500,000 cubic feet a month. One, the Kellogg Company, was located in the Papillion drainage area. The other 11 were located in the Missouri drainage area. The sewage from the Papillion area, relatively small and largely residential, flowed into a secondary treatment facility. All sewage from the Missouri area was discharged without treatment until 1964 when some sewage was received at a primary treatment facility.
In 1967 urban growth overloaded the Papillion treatment plant while the Missouri plant was operating at 22 percent of capacity. Small amounts of sewage from 1 of the 11 large industrial consumers of water in the Missouri area received treatment. The sewage from 3 of the others was also processed. All other sewage from the 11 was discharged without treatment.
The city had divided users of the sewer service into a residential class and a commercial and industrial class. A residential user was one who received "water service from any supply source in any single family dwelling used exclusively as a place of abode." The city charged $.80 a month for service to a residential user within the city. Commercial and industrial users were generally subject to a scale based upon water supply each month as follows:

First 400 c. f. $.80
Next 4,600 " " .042 per c. c. f.
 " 45,000 " " .03 " "
 " 50,000 " " .026 " "
 " 1,400,000 " " .022 " "
Excess over 1,500,000 " " .006 " "

To cover sewer service costs on delinquent accounts, the city in 1963 levied "special assessments" on lands in the city. Occupants of two of the parcels were a tenant of plaintiff R. K. Rutherford and a vendee or mortgagor of plaintiff Nebraska Investment Company. The city certified the amounts directly to the county treasurer. Each sum represented a 6-month charge of $4.80 and a processing charge of $3. "Special assessments" relating to other periods were subsequently levied in like manner against both parcels.
Intervener operated a restaurant using water quantities of 5,325 c. c. f. in 1964; 4,487 c. c. f. in 1965; and 1,565 c. c. f. in the first 5 months of 1966. For sewer service to the restaurant in 1965 the city charged $148.67 as follows: 264 c. c. f., $9.15; 255 c. c. f., $8.88; 280 c. c. f., $9.63; 301 c. c. f., $10.26; 314 c. c. f., $10.65; 378 c. c. f., $12.57; 422 c. c. f., $13.89; 478 c. c. f., $15.57; 674 c. c. f., $20.75; 395 c. c. f., $13.08; 354 c. c. f., $11.85; and 372 c. c. f., $12.39.
The sole public supplier of water to Omaha was Metropolitan Utilities District which also served areas outside the Omaha sewer system. All service areas of the district were included in a study made by a rate analyst to determine frequency distribution of water billings in 1965. The analyst selected customer classes described as large industrial, general industrial, large commercial, small or general commercial, and residential. Whether a customer belonged *226 to the residential class or to the small commercial class depended upon the size of his metered service. The criteria differed somewhat from the criteria of classes of sewer users.
In the study the analyst prepared an exhibit showing (1) user class; (2) gradation of water use in units of 100 cubic feet in a column headed "STEP"; (3) at each step the cumulative number of billings, or "CUMLTV CUST"; and (4) cumulative water use connected with the billings and tabulated in a column headed "CUMLTV USE." Some of the statistics are:

CUSTOMER CLASS STEP CUMLTV CUST CUMLTV USE
Res. 31,530
 " 1 60,497 28,967
* * * * * * * * * * * *
Res. 7 525,140 2,253,811
 " 8 599,091 2,845,419
 " 9 665,824 3,446,016
* * * * * * * * * * * *
Res. 370 1,022,446 9,411,950
* * * * * * * * * * * *
Res. 5501 1,022,502 9,459,684
Gen. Com. 4,348
Gen. Com. 1 8,300 3,952
* * * * * * * * * * * *
Gen. Com. 12 37,132 181,447
 " " 14 39,996 220,111
* * * * * * * * * * * *
Gen. Com. 55 63,232 898,988
 " " 60 64,348 963,670
* * * * * * * * * * * *
Gen. Com. 15001 78,957 4,405,994
Lg. Com. 24
 " " 1 28 4
* * * * * * * * * * * *
Lg. Com. 15001 1,163 2,326,053
Gen. Ind. 17
 " " 1 21 4
* * * * * * * * * * * *
Gen. Ind. 15001 586 2,190,106
Lg. Ind. 190 1 185
* * * * * * * * * * * *
Lg. Ind. 15001 73 2,031,848

An ordinance in substance stated that the city reserved the right to deviate from normal sewer use rates in the interest of fairness to city and user alike. Decreases were granted to some customers on the ground that water use was an inaccurate indicator of use of the sewers and treatment facilities. Six of those customers were Falstaff and Storz breweries, O.P. P.D. steam plant, Quaker Oats Company, Campbell Soup Company, and Union Stock Yards Company. They were 6 of the 11 *227 large industrial water consumers located in the Missouri drainage area. A comparison of water use in 1965 with sewer service charges paid by the 12 large industrial water consumers disclosed:

User Water Use Sewer Charge
Armour & Co. 2,083,872 c. c. f. $15,468.79
Cudahy Packing Co. 693,264 " 7,127.79
Union Stock Yards Co. 2,427,627 " 10,091.75
Wilson & Co. 721,622 " 7,296.10
Swift & Co. 1,562,903 " 12,344.19
Kellogg Co. 213,411 " 2,551.16
Campbell Soup Co. 426,956 " 4,276.35
O.P.P.D. steam plant 434,388 " 1,389.37
Quaker Oats Co. 406,761 " 597.46
Storz brewery 173,312 " 2,212.49
Falstaff brewery 288,151 " 2,817.38
U.P.R.R. shops 526,377 " 6,125.01

The city had issued sanitary sewerage revenue bonds, series of 1957. From a federal grant of $250,000 and the proceeds of the bonds, the city then had $2,921,731 available for construction projects. It obligated $2,174,230 for construction of the Papillion plant and the balance for construction and improvement of sewers. In 1964 and 1965 the activity of the sewer revenue fund included the following:

 1964 1965
Receipts:
 Sewer service collections:
 Residential units $ 726,943.02 $ 754,127.29
 Commercial and industrial units 435,434.46 449,158.83
 Other 114,708.93 95,817.31
 _____________ _____________
 Total $1,277,086.41 $1,299,103.43
Disbursements:
 Sewer revenue operations and maintenance
 account $236,535.45 $231,208.11
 Papillion sewerage treatment account 217,076.87 216,974.34
 Missouri sewerage treatment account 204,874.03 406,891.08
 Sewer revenue improvement account 600,789.12 247,489.09
 Sewerage collection account 95,285.54 95,428.38

We infer that in 1965 residential customers, whose share of water use was 34.4 percent, paid 62.7 percent of all sewer use charges.
The Legislature has authorized municipalities to establish equitable rates or charges for use of treatment plants and sewerage systems. See, s. 14-365.03, R. *228 S.Supp.1967; s. 18-503, R.R.S.1943. The requirement that rates and charges be equitable is declaratory of the common law which prohibits unjust discrimination by a public utility. A difference in utility rates under substantially similar conditions of service may constitute unjust discrimination. On the other hand, rate differences fairly proportionate to differences in cost or difficulty of service are valid. See, Western Union Telegraph Co. v. Call Publishing Co., 44 Neb. 326, 62 N.W. 506, 27 L.R.A. 622, 48 Am.S.R. 729, affirmed 181 U.S. 92, 21 S.Ct. 561, 45 L.Ed. 765, 58 Neb. 192, 78 N.W. 519.
In determining reasonable rate relationships, a municipality may sometimes take into account the purpose for which a customer receives the service. Cornhusker Electric Co. v. City of Fairbury, 134 Neb. 248, 278 N.W. 379. See, also, Oradell Village v. Tp. of Wayne, 98 N.J. Super. 8, 235 A.2d 905. Courts have recognized that differences in sewer use rates for residential customers and various other customers may be reasonable. Some customers may be subject to a flat rate while other customers are subject to rates based on water consumption or type and number of receptacles. See, Sharp v. Hall, 198 Okl. 678, 181 P.2d 972; Gericke v. City of Philadelphia, 353 Pa. 60, 44 A.2d 233; Hickory Township v. Brockway, 201 Pa. Super. 260, 192 A.2d 231; Bexar County v. City of San Antonio (Tex.Civ.App.), 352 S.W.2d 905; Town of Port Orchard v. Kitsap County, 19 Wash.2d 59, 141 P.2d 150; Antlers Hotel, Inc. v. Town of City of Newcastle, 80 Wyo. 294, 341 P.2d 951.
In form the Omaha rate structure with its user classes, flat rate, and scale rates satisfied the requirement of uniformity. In effect the structure failed to achieve perfect equality, but perfection is not the standard of municipal duty. The city might reasonably consider (1) the cost of construction and operation of the treatment facilities in connection with the city's inability to process all industrial wastes; (2) the substantial cost of construction, improvement, and maintenance of sewers for the principal beneficiary, the residential class; and (3) situations in which the degree of correlation between water consumption and sewer use was low. In light of present complaints and the evidence, the rate relationships were reasonable; there is no persuasive evidence of unjust discrimination against plaintiffs or intervener.
Statutes relating to collection of delinquent accounts have provided in part: "If any service charge * * * is not paid when due, * * * it may be certified to the tax assessor and assessed against the premises served, and collected or returned in the same manner as other municipal taxes are certified, assessed, collected, and returned * * *." S. 14-365.03, R.S.Supp. 1967; s. 18-503, R.R.S.1943.
Sewer use charges are not special assessments. Michelson v. City of Grand Island, 154 Neb. 654, 48 N.W.2d 769, 26 A.L.R.2d 1346. We construe the statutes to authorize liens for payment of amounts overdue. It is unimportant for present purposes that the city described the unpaid charges as "special taxes" and "special assessments." See, City of Glendale v. Trondsen, 48 Cal.2d 93, 308 P.2d 1; Patterson v. City of Chattanooga, 192 Tenn. 267, 241 S.W.2d 291; Murray City v. Board of Education of Murray City School Dist., 16 Utah 2d 115, 396 P.2d 628. Legislative intent controls the construction of a phrase in an ordinance, although the phrase is inappropriate. See, Starman v. Shirley, 162 Neb. 613, 76 N.W. 2d 749; 6 McQuillin, Municipal Corporations (3d Ed.), s. 20.56, p. 134. The omission of the city first to certify the amounts to the tax assessor was an inconsequential irregularity. Cf. Belza v. Village of Emerson, 159 Neb. 651, 68 N.W.2d 272.
The processing charge of $3 did not defray the expense, of which publication constituted a substantial item. The *229 city had authority to make necessary rules and regulations. See, s. 14-365.03, R.S. Supp.1967; s. 18-503, R.R.S.1943. In collecting a sewer service charge unpaid at due date, a municipality may add a reasonable processing charge. It is argued that the city wasted money by adopting such a procedure, but a better method is not suggested. The processing charge was reasonable.
The judgment is affirmed.
Affirmed.