329 So.2d 314 (1976)
CONTRACTORS AND BUILDERS ASSOCIATION OF PINELLAS COUNTY et al., Petitioners,
v.
CITY OF DUNEDIN, Florida, Respondent.
No. 47662.
Supreme Court of Florida.
February 25, 1976.
Rehearing Denied April 2, 1976.
*316 John T. Allen, Jr., St. Petersburg, for petitioners.
C. Allen Watts, of Fogle & Watts, Deland, for respondent.
Ralph A. Marsicano and Burton M. Michaels, Tallahassee, for the Florida League of Cities, Inc., amicus curiae.
Thomas G. Pelham of Brown, Smith, Young & Pelham, Tallahassee, for the National Home Builders Association, amicus curiae.
HATCHETT, Justice.
In an action for declaratory judgment, brought against the City of Dunedin in Circuit Court, provisions of certain ordinances[1] were adjudged defective, as *317 being an ultra vires attempt by the city to impose taxes; and the city was enjoined from collecting fees the ordinances required as a precondition for municipal water and sewerage service. In addition, the Circuit Court ordered the City to refund the fees, but only to persons who had paid under protest. On appeal to the District Court of Appeal, Second District, that court reversed the circuit court judgment, City of Dunedin, Florida v. Contractors and Builders Association of Pinellas County, etc. et al., 312 So.2d 763; and, on June 10, 1975, certified that its decision passed upon a question of great public interest. As is customary in cases where such certificates have been entered, we exercise our discretion to review on its merits the decision below. E.g., Grant v. State, 316 So.2d 282 (Fla. 1975); Winston v. State, 308 So.2d 40 (Fla. 1974) (reh. den. 1975). See Fla. Const. art. V, § 3(b)(3).
Plaintiffs in the trial court, petitioners here, are building contractors, an incorporated association of contractors, and owners of land situated within the city limits of Dunedin.[2] They do not complain of all the fees Dunedin requires to be collected upon issuance of building permits,[3] but contend that monies which the city collects and earmarks for "capital improvements to the [water and sewerage] system as a whole" (R. 725) constitute taxes, which a municipality is forbidden to impose, in the absence of enabling legislation. It is agreed on all sides that "a municipality cannot impose a tax, other than ad valorem taxes, unless authorized by general law," 312 So.2d at 766, and that no general law gives such authorization here. Respondent contends that these fees are not taxes, but user charges analogous to fees collected by privately owned utilities for services rendered. For the reasons stated in Judge Grimes' scholarly opinion, we accept this analogy, but we decline to uphold a revenue generating ordinance that omits provisions we deem crucial to its validity. We are unpersuaded, moreover, that the limitations, which the city has in fact placed on fees collected pursuant to Dunedin, Fla., Code §§ 25-31, 25-71(c) and (d), can suffice to make those fees "just and equitable", within the meaning of Fla. Stat. § 180.13(2) (1973). In principle, however, we see nothing wrong with transferring to the new user of a municipally owned water *318 or sewer system a fair share of the costs new use of the system involves.
Petitioners contend that Dunedin has imposed a tax under the guise of setting charges for water and sewer connections, relying on Broward County v. Janis Development Corp., 311 So.2d 371 (Fla. 4th Dist. 1975) aff'g Janis Development Corp. v. City of Sunrise, 40 Fla. Supp. 41 (17th Cir.1973); Pizza Palace of Miami v. City of Hialeah, 242 So.2d 203 (Fla. 3d Dist. 1972); and Venditti-Siraro, Inc. v. City of Hollywood, 39 Fla. Supp. 121 (17th Cir.1973). The Pizza Palace case is wholly inapposite, and the others are readily distinguishable. Only if the moneys collected in Venditti-Siraro and Janis Development had been used to underwrite the administrative costs of issuing building permits, or other costs incurred in enforcing building codes, would those cases be analogous to the present one. Compare State ex rel. Harkow v. McCarthy, 126 Fla. 433, 171 So. 314 (1936) with City of Panama City v. State, 60 So.2d 658 (Fla. 1952). The analogy would be very close if the fees had been earmarked for future capital outlay: for example, acquisition of automobiles for building inspectors to use in their work.
But the fees in Janis Development and Venditti-Siraro bore no relationship to (and were greatly in excess of) the costs of the regulation which was supposed to justify their collection. In each case, the fees were required to be paid as a condition for issuance of building permits. In the Janis Development case, $200.00 per dwelling unit built was put into a fund for road maintenance. In Venditti-Siraro, one percent of estimated construction costs went into a fund for parks. Because the surcharges were collected for purposes extraneous to the enforcement of the building code, the courts concluded that the surcharges amounted in law to taxes, which the municipalities had not been authorized to impose. In contrast, evidence was adduced here that the connection fees were less than costs Dunedin was destined to incur in accommodating new users of its water and sewer systems. We join many other courts in rejecting the contention that such connection fees are taxes.[4]
The avowed purpose of the ordinance in the present case is to raise money in order to expand the water and sewerage systems, so as to meet the increased demand which additional connections to the system create. The municipality seeks to shift to the user expenses incurred on his account. A private utility in the same circumstances would presumably do the same thing, in which event surely even petitioners would not suggest that the private corporation was attempting to levy a tax on its customers.[5]
*319 Under the constitution, Dunedin, as the corporate proprietor of its water and sewer systems, can exercise the powers of any other such proprietor (except as Fla. Stat. §§ 180.01 et seq., or statutes enacted hereafter, may otherwise provide.)[6] Municipal corporations have "governmental, corporate and proprietary powers" and "may exercise any power for municipal purposes, except as otherwise provided by law." Fla. Const. art. VIII, § 2(b); City of Miami Beach v. Fleetwood Hotel, Inc., 261 So.2d 801 (Fla. 1972).[7] "Implicit in the power to provide municipal services is the power to construct, maintain and operate the necessary facilities." Cooksey v. Utilities Commission, 261 So.2d 129, 130 (Fla. 1972). There are no provisions in Chapter 180, Florida Statutes, expressly governing capital acquisition other than through deficit financing,[8] but it is provided that the "legislative body of the municipality... may establish just and equitable rates or charges" for water and sewerage. Fla. Stat. § 180.13(2) (1973). See generally Annot., 61 A.L.R.3d 1236, 1248-1259 (1975).
When a municipality sells debentures as a means of financing the extension or enlargement of a public utility, the indebtedness thus incurred is eventually made good with utility revenues; and anticipated revenues "may be pledged to secure moneys advanced for the ... improvement." Fla. Stat. § 180.07(2) (1973). When money for capital outlay is borrowed, water and sewer rates are set with a view towards raising the money necessary to repay the loan. State v. City of Tampa, 137 Fla. 29, 187 So. 604, 609 (1939); State v. City of Miami, 113 Fla. 280, 152 So. 6 (1933) (reh. den. 1934) ("certificates of indebtedness ... are payable as to both principal and interest solely out of a special fund to be created ... out of the net earnings" At 13).
Water and sewer rates and charges do not, therefore, cease to be "just and equitable" merely because they are set high enough to meet the system's capital requirements, as well as to defray operating expenses. State v. City of Tampa, supra; State v. City of Miami, supra. We see no reason to require that a municipality resort to deficit financing, in order to raise capital by means of utility rates and charges. On the contrary, sound public policy militates against any such *320 inflexibility.[9] It may be a simpler technical task to amortize a known outlay, than to predict population trends and the other variables necessary to arrive at an accurate forecast of future capital needs. But raising capital for future use by means of rates and charges may permit a municipality to take advantage of favorable conditions, which would alter before money could be raised through issuance of debt securities; and the day may not be far distant when municipalities cannot compete successfully with other borrowers for needed capital. The weight of authority supports the view that raising capital for future outlay is a legitimate consideration in setting rates and charges. Hayes v. City of Albany, 7 Or. App. 277, 490 P.2d 1018 (1971); Hartman v. Aurora Sanitary District, 23 Ill.2d 109, 177 N.E.2d 214 (1961); Home Builders Ass'n of Greater Salt Lake v. Provo City, 28 Utah 2d 402, 503 P.2d 451 (1972).
It is also established that differential utility rates and charges may be "just and equitable". Fla. Stat. § 180.13(2) (1973); Hayes v. City of Albany, supra, notwithstanding the differential. In Brandel v. Civil City of Lawrenceburg, 249 Ind. 47, 230 N.E.2d 778 (1967), the court upheld an ordinance setting differential connection charges where two distinct sewerage systems had been engineered in the same political entity. The user connecting to the more expensive system paid a higher connection charge. Another common type of differential charge makes the character of the user determinative of utility rates:
In determining reasonable rate relationships, a municipality may sometimes take into account the purpose for which a customer receives the service. .. . Courts have recognized that differences in sewer use rates for residential customers and various other customers may be reasonable. Some customers may be subject to a flat rate while other customers are subject to rates based on water consumption or type and number of receptacles. Rutherford v. City of Omaha, 183 Neb. 398, 160 N.W.2d 223, 228 (1968) (authorities omitted)
Dunedin distinguishes between residential and commercial users, on one hand, and industrial users, on the other. See ante, pp. 316-317 n. 1, and petitioners do not question this distinction. Here the issue is whether differential connection charges are "just and equitable", when they vary depending on the time at which the connection to the utility system is made.
Raising expansion capital by setting connection charges, which do not exceed a pro rata share of reasonably anticipated costs of expansion, is permissible where expansion is reasonably required, if use of the money collected is limited to meeting the costs of expansion.[10] Users "who benefit expecially, not from the maintenance of the system, but by the extension of the system ... should bear the cost of that extension." Hartman v. Aurora Sanitary District, supra, 177 N.E.2d at 218. On the other hand, it is not "just and equitable" for a municipally owned utility to impose the entire burden of capital expenditures, including replacement of existing plant, on persons connecting to a water and sewer system after an arbitrarily chosen time certain.
*321 The cost of new facilities should be borne by new users to the extent new use requires new facilities, but only to that extent. When new facilities must be built in any event, looking only to new users for necessary capital gives old users a windfall at the expense of new users.
When certificates of indebtedness are outstanding, new users, like old users, pay rates which include the costs of retiring the certificates, which represent original capitalization. State v. City of Miami, supra. New users thus share with old users the cost of original facilities. For purposes of allocating the cost of replacing original facilities, it is arbitrary and irrational to distinguish between old and new users, all of whom bear the expense of the old plant and all of whom will use the new plant.[11] The limitation on use of the funds, shown to exist de facto in the present case, has the effect of placing the whole burden of supplementary capitalization, including replacement of fully depreciated assets, on a class chosen arbitrarily for that purpose.
In Hayes v. City of Albany, supra, the situation was very much like the situation here. An existing system faced the imminent prospect of expansion and, as of a date certain, residential connection fees climbed from $25 to $255. (An hypothetical industrial user's charges soared from $200 to a prohibitive $400,000.) These charges were to be deposited in a fund restricted as follows:
All monies received from the Sewer Connection Charges plus interest, if any, shall be deposited in the Sanitary Sewer Capital Reserve Fund ... and shall be expended from that fund only for the purpose of making major emergency repairs, extending or oversizing, separating, or constructing new additions to the treatment plant or collection and interceptor systems. 490 P.2d at 1020.
If the ordinance in the present case had so restricted use of the fees which it required to be collected, there would be little question as to its validity. We conclude that the ordinance in the present case cannot stand as it is written.
The same considerations which underlie statutes of frauds require that a revenue producing ordinance explicitly set forth restrictions on revenues it generates, where such restrictions are essential to its validity. As between private parties, a contract "that is not to be performed within the space of one year", Fla. Stat. § 725.01 (1973), or which is "for the sale of goods for the price of $500 or more", Fla. Stat. § 672.201 (1973), is unenforceable unless reduced to writing, with certain exceptions not pertinent here. Counsel for respondent has represented that the fees collected under the ordinance exceed $196,000.00. Brief for Respondent at 53. Nothing in the record indicates that capital outlay for expansion will be completed within a year's time.
The failure to include necessary restrictions on the use of the fund is bound to result in confusion, at best. City personnel may come and go before the fund is exhausted, yet there is nothing in writing to guide their use of these moneys, although certain uses, even within the water and sewer systems, would undercut the legal basis for the fund's existence. There is no justification for such casual handling of public moneys, and we therefore hold that the ordinance is defective for failure to spell out necessary restrictions on the use of fees it authorizes to be collected.[12] *322 Nothing we decide, however, prevents Dunedin from adopting another sewer connection charge ordinance, incorporating appropriate restrictions on use of the revenues it produces. Dunedin is at liberty, moreover, to adopt an ordinance restricting the use of moneys already collected. We pretermit any discussion of refunds for that reason.
The decision of the District Court of Appeal is quashed and this case is remanded to the District Court with directions that the District Court dispose of the question of costs; and that the District Court thereafter remand for further proceedings in the trial court not inconsistent with this opinion. In the trial court's consideration de novo of the question of refunds the chancellor is at liberty to take into account all pertinent developments since entry of his original decree.
It is so ordered.
ADKINS, C.J., and ROBERTS, OVERTON and ENGLAND, JJ., concur.
NOTES
[1] The ordinances setting water and sewerage connection charges or otherwise pertinent are the following:

Sec. 25-14. Sewage connection required; notice.
The owner of any house, building, or property used for human occupancy, employment, recreation, or other purpose, situated within the city and abutting on any street, alley or right-of-way in which there is now located or may in the future be located a public sanitary or combined sewer of the city, is hereby required at his expense to install suitable toilet facilities therein, and to connect such facilities directly with the proper public sewer in accordance with the provisions of this chapter, within ninety (90) days after date of official notice to do so, provided that said public sewer is within two hundred (200) feet of the house, building, or properties used for human occupancy... .
Sec. 25-31. Same  Classes of permits; contents; inspection fees.
There shall be two classes of building sewer permits: (1) for residential and commercial service; and (2) for service to establishments producing industrial waste. In either case, the owner or his agent shall make application on a special form furnished by the city. The permit application shall be supplemented by any plans, specifications, or other information considered pertinent in the judgment of the city sewer superintendent. No permit will be issued unless the assessment as set forth in section 25-71(c) and (d) has been paid... .
Sec. 25-32. Same  Costs paid by owner.
All costs and expense incident to the installation, connection and maintenance of the building and collector sewers shall be borne by the owners. The owners shall indemnify the city from any loss or damage that may directly or indirectly be occasioned by the installation of the building sewer.
Sec. 25-71. Meters  Connection or installation charge.
(a) The connection charge for the installation of a meter inside the city shall be as follows:

 5/8" meter ________________ $ 95.00
 1" meter ________________ 170.00
 1-1/2" meter ________________ 265.00
 2" meter ________________ 360.00

(b) The connection charge for the installation of a meter outside the city limits shall be as follows:

 5/8" meter _________________ $105.00
 1" meter _________________ 180.00
 1-1/2" meter _________________ 290.00
 2" meter _________________ 390.00

(c) In addition to the meter installation charges described herein, there shall be paid an assessment to defray the cost of production, distribution, transmission and treatment facilities for water and sewer provided at the expense of the City of Dunedin, as follows:
 Each dwelling unit; for water ______ $325.00
 for sewer _________________________ 475.00
 Each transient unit; for water _____ 150.00
 for sewer _________________________ 275.00
 Each business unit; for water ______ 325.00
 for sewer _________________________ 475.00
(d) The assessments as set forth herein shall be payable upon issuance of the building permit for said unit or units in the case of new construction, or in the case of a presently existing structure or structures, such assessments shall be payable when the permits for water or sewer connections are issued.
Petitioners challenge as unlawful the fees prescribed by Dunedin, Fla.Code § 25-71(c).
[2] Petitioners take the position that the ordinance is bad, if for no other reason, then because it denies equal protection of the laws to new residents of Dunedin. There is a substantial question whether petitioners here have standing to assert new residents' rights. Construction Industry Association of Sonoma County v. City of Petaluma, 522 F.2d 897, 44 U.S.L.W. 2093 (9th Cir., 1975). Assuming standing arguendo, the ordinance easily meets the rational basis test, see post, pp. 319-320, and no right to travel interstate is affected, contrary to petitioners' assertion. Cf. Annot., 63 A.L.R.3d 1184 (1975). In Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), welfare recipients were disqualified as such for one year by moving into Connecticut. Under Dunedin's ordinance, a joint water and sewer connection costs approximately $800.00, regardless of whether the new user comes from Dunedin, elsewhere in Florida, or from another state or country.
[3] In the event of connection to an existing structure, the fees are payable "when the permits for water or sewer connections are issued." Dunedin, Fla.Code § 25-71(d). The complaint here did not allege existing structures on the plaintiffs' land, however.
[4] The Supreme Court of Illinois, in Hartman v. Aurora Sanitary District, 23 Ill.2d 109, 177 N.E.2d 214 (1961), observed at 219:

We have found that such reasonable charges have been uniformly sustained as a service charge rather than a tax. City of Maryville v. Cushman, 363 Mo. 87, 249 S.W.2d 347; State ex rel. Gordon v. Taylor, 149 Ohio St. 427, 79 N.E.2d 127; City of North Muskegon v. Bolema Construction Co., 335 Mich. 520, 56 N.W.2d 371; Chastain v. Oklahoma City, 208 Okla. 604, 258 P.2d 635.
[5] Petitioners contend that utility revenues constitute taxes, to the extent such revenues are expended for purposes unrelated to the utility. Nothing prohibits a muncipality's "making a modest return of its utility operation or certain portions thereof, providing the rate is not unreasonable." Pinellas Apartment Ass'n v. City of St. Petersburg, 294 So.2d 676, 678 (Fla. 2d Dist. 1974); Mitchell v. Mobile, 244 Ala. 442, 13 So.2d 664 (1943). Contra, Madera v. Black, 181 Cal. 306, 184 P. 397 (1919). Augmenting general revenues is a natural use for such profits, and general revenues are expended for the whole range of municipal purposes. Privately held utilities also apply a modest portion of revenues to public or charitable purposes, and such charitable contributions are counted as operating expenses, when rates and charges are calculated. Miami v. Florida Public Service Comm'n, 208 So.2d 249, 258-9 (Fla. 1968) ("if contributions are of a reasonable amount to recognized and appropriate charities, then they may be classified as legitimate operating expenses." At 259); Re General Telephone Co., 44 P.U.R. 2d 247 (Fla.R.R. & P.U.C. 1962). See generally Annot., 59 A.L.R.3d 941 (1974). Just as a modest surplus over costs of regulation does not invalidate regulatory fees, State ex rel. Harkow v. McCarthy, 126 Fla. 433, 171 So. 314 (1936) (parking meters permissible unless "city was making inordinate and unjustified profits" At 317), so a modest profit from operation of a public utility does not transform user charges into taxes. Pinellas Apartment Ass'n v. City of St. Petersburg, supra. On the other hand, unreasonable reliance on utility revenues does amount to "imposing upon [ratepayers] unfair tax burdens." Mitchell v. Mobile, 13 So.2d at 667. Cf. City of Panama City v. State, 60 So.2d 658 (Fla. 1952).
[6] Chapter 180 was enacted before the 1968 Constitution was adopted, and some language in the chapter is anachronistic. The statutes refer to "powers granted by this chapter," Fla. Stat. §§ 180.03(1), .21 (1973), whereas, under the 1968 Constitution, the provisions of Chapter 180 are restrictions on the exercise of power the constitution itself confers, rather than the grant of powers these statutory provisions formerly constituted.
[7] But a municipality's power to tax is subject to the restrictions enumerated in Fla. Const. art. VII § 9 including the restriction discussed above. City of Tampa v. Birdsong Motors, Inc., 261 So.2d 1 (Fla. 1972).
[8] Special assessments are another common means of financing sewer construction. Fla. Stat. § 170.01 (1973). The fees in controversy here are not special assessments. They are charges for use of water and sewer facilities; the property owner who does not use the facilities does not pay the fee. Under no circumstances would the fees constitute a lien on realty.
[9] Petitioners cite Norwick v. Village of Winfield, 81 Ill. App.2d 197, 225 N.E.2d 30 (2d Dist. 1967) in which it was held that an Illinois municipality was without authority to raise money for future capital requirements, by collecting connection fees in excess of actual connection costs. But the decision in that case turned on the construction of a statute granting the Village of Winfield municipal powers, and is of no relevance to the present case. The Illinois court remarked: "The Village directs our attention to foreign cases. These are of no assistance... . This is particularly true in states with so-called `home rule' municipalities [like Florida]."
[10] The "costs of expansion" may sometimes be difficult to identify precisely when certain kinds of capital expenditures are made; in this matter, too, "perfection is not the standard of municipal duty." Rutherford v. City of Omaha, supra 160 N.W.2d at 228.
[11] There is authority to the contrary. Hartman v. Aurora Sanitary District, supra; Home Builders Ass'n of Greater Salt Lake v. Provo City, supra. In Provo City, an ordinance like Dunedin's was upheld even though the fees were used for "general operating expenses." 503 P.2d at 451. We reject the view these cases represent.
[12] If subsection c were excised from Dunedin, Fla.Code § 25-71, the ordinance would be unobjectionable, because reasonable meter connection charges may permissibly furnish utility revenues for unrestricted use within the utility system. The validity of such charges does not depend on limitation of their use.