957 So.2d 671 (2007)
SAVE OUR SEPTIC SYSTEMS COMMITTEE, INC., William B. Bishop, Katherine L. Bishop, Daniel W. Bush, Janet S. Bush, Jordan L. Gay, Erma C. Gay, William King, Kathryn H. King, and Richard Moyer, individually and on behalf of all others similarly situated, Appellants,
v.
SARASOTA COUNTY, Appellee.
No. 2D05-6143.
District Court of Appeal of Florida, Second District.
April 27, 2007.
*672 Donald E. Hemke of Carlton Fields, P.A., Tampa, for Appellants.
Stephen E. DeMarsh, County Attorney, and Gary K. Oldehoff and Scott T. Bossard, Assistant County Attorneys, Sarasota, for Appellee.
ALTENBERND, Judge.
Save Our Septic Systems Committee, Inc., and several residents of Sarasota County (collectively "SOSS"), appeal a summary final judgment dismissing their complaint for declaratory and injunctive relief against Sarasota County. Although the complaint contained four counts, SOSS challenges only the dismissal of counts II and III, which were resolved on the County's motion to dismiss or for partial summary judgment. These counts challenged the County's imposition of a "capacity fee" or impact fee and a surcharge in connection with the County's demand that these residents abandon the use of individual septic systems and instead hook up to the County's central sewage system. The order granting summary judgment and dismissal on these counts merely granted the motion without any explanation of the trial court's reasoning. We conclude that the County failed to prove the absence of any genuine issue of material fact, or that its capacity fee and surcharge are appropriate as a matter of law. Accordingly, as to counts II and III we reverse and remand for further proceedings.
This dispute began as a disagreement between the County and residents in the Phillippi Creek Water Basin. The County wished to discontinue the use of septic systems in this area, allegedly for environmental reasons, and to compel the residents to hook up to the County's central sewer system. In order to hook up to the central sewer system, the existing users of septic systems would be required to pay a "capacity fee" or impact fee. There was also the possibility that they would be required to pay an additional surcharge. The local residents did not want to give up their septic systems or pay the additional charges, so they created SOSS and filed a lawsuit against the County.
The initial lawsuit was filed in April 2002. It was amended only once, in July 2002. The lawsuit contained allegations to permit a class action, but that status was never achieved. The amended complaint contained four counts. In count I, SOSS argued that the County lacked the power to compel the residents to connect to the central sewer system. Count II argued that the County was imposing a capacity fee of $1642 on each "equivalent dwelling unit" as an impact fee, but was in fact intending to divert at least $10,000,000 of the revenue from this capacity fee to repay existing indebtedness. This count argued that the County thus intended to use the proceeds of the impact fee to improperly benefit existing customers, rather than to absorb the impact of new hookups. In count III, SOSS explained that the County planned to impose an additional surcharge fee that could be as little as zero dollars or as much as $17.50 per month per resident. It asked that the court declare that the County could not legally impose this surcharge fee exclusively against the new users because the County intended to fund *673 a sewer system capital improvement program for the whole county. Finally, in count IV, SOSS challenged the financing and implementation of a program that helped some residents obtain reimbursement for their mandated connections to the central sewer system.
The County immediately responded to this amended complaint by filing a combined motion to dismiss and motion for partial summary judgment. As SOSS's name would suggest, the primary emphasis of the legal arguments by both sides focused on count I and the County's power to require the residents to join the central sewer system. SOSS lost that argument and has elected not to challenge that ruling on appeal. Likewise, it has abandoned its efforts to challenge the reimbursement program. Thus only counts II and III remain at issue.
The crux of the dispute in this case involves the proper imposition of impact fees as a means to finance capital improvements to a local government's infrastructure. Impact fees have been defined as "scheduled charges applied to new development to generate revenue for the construction or expansion of capital facilities located outside the boundaries of the new development (off-site) that benefit the contributing development." Ronald H. Rosenberg, The Changing Culture Of American Land Use Regulation: Paying For Growth With Impact Fees, 59 S.M.U. L.Rev. 177, 206 (Winter 2006) (citing James C. Nicholas, Arthur C. Nelson & Julian C. Juergensmeyer, A Practitioner's Guide to Development Impact Fees 1-2 (1991)).
In determining whether the imposition of an impact fee is constitutionally permissible, the Florida Supreme Court has adopted the "dual rational nexus test," which requires the local government to demonstrate "a reasonable connection, or rational nexus, between the need for additional capital facilities and the growth in population generated by the subdivision" and "a reasonable connection, or rational nexus, between the expenditures of the funds collected and the benefits accruing to the subdivision." St. Johns County v. N.E. Fla. Builders Ass'n, 583 So.2d 635, 637 (Fla.1991) (citing Hollywood, Inc. v. Broward County, 431 So.2d 606, 611-12 (Fla. 4th DCA 1983)).
In Contractors & Builders Ass'n v. City of Dunedin, 329 So.2d 314 (Fla.1976), the supreme court observed, "In principle . . . we see nothing wrong with transferring to the new user of a municipally owned water or sewer system a fair share of the costs new use of the system involves." Id. at 317. The supreme court thus approved a local government's use of an impact fee to raise "expansion capital" for a sewer system "by setting connection charges, which do not exceed a pro rata share of reasonably anticipated costs of expansion" when expansion is "reasonably required" and "the money collected is limited to meeting the costs of expansion." Id. at 320.
When the supreme court issued its opinion in Contractors & Builders Ass'n, 329 So.2d 314, the Florida Statutes encouraged and empowered local governments to adopt comprehensive plans for development, but did not mandate the same. See §§ 163.160-.315, Fla. Stat. (1969). In 1985, however, many of the permissive provisions of this chapter were repealed and were replaced with sections mandating the adoption of comprehensive plans and development in accordance with those plans. See ch. 85-55, §§ 6, 19, 20, Laws of Fla. In 1986, the legislature adopted what is currently section 163.3177(10)(h), Florida Statutes (2005), establishing the legislative intent that "public facilities and services needed to support development shall be available concurrent with the impacts of *674 such development." See ch. 86-191, § 7, Laws of Fla. The current version of this statute now explicitly refers to section 163.3180, which is entitled "Concurrency," and specifically provides that sanitary sewer systems are "subject to [this] concurrency requirement on a statewide basis" and that "sanitary sewer . . . facilities shall be in place and available to serve new development no later than the issuance by the local government of a certificate of occupancy or its functional equivalent." § 163.3180(1)(a), (2)(a).[1]
These extensive comprehensive planning requirements encourage communities to anticipate development and build the infrastructure before development, rather than allowing it to lag behind development. On the other hand, they make it more difficult to distinguish between the costs of existing facilities meeting present use and the costs of expansion related solely to future use.
In addition, the County points out that often the financing for additional capital-expansion projects is contingent upon the reduction of existing indebtedness. This too is a factor making a clear distinction between existing costs and expansion costs difficult or perhaps impossible, particularly in the context of an ever-expanding infrastructural system such as a sewage and wastewater management system.

COUNT II: THE CAPACITY FEE
Count II alleges that the impact fee is anticipated to generate $23,000,000 from the residents in the Phillippi Creek Water Basin and that the County "intends to divert $10,000,000 of that total collection and apply that amount to reducing [the County's] existing sewer system indebtedness." SOSS claims that the $13,000,000 payment is all that is required for the "Septic System Replacement Program" and that the remaining $10,000,000 is a payment above and beyond these residents' fair share of the cost of any expansion of the sewer system required by the new users. SOSS has also suggested that the current system has excess capacity sufficient to meet the needs of all current Phillippi Creek residents and thus no further capital expansion would be required.
The County has disputed some of the factual allegations made by SOSS, particularly those related to how it intends to spend the funds raised by the capacity fee. The record does not clearly establish whether the County will be required to build new facilities to accommodate these new users or what the cost of such new facilities would be. The County has specifically asserted that payment of existing debt is necessary to expand the sewer system and thus the impact fee is appropriately applied to this expense. Some of the County's submissions suggest that the capacity fee may not be intended to act as a traditional "impact fee" to pay for expansion but is instead an attempt to determine the new users' pro rata share of the costs of existing capacity. Indeed, in its brief, the County now refers to the charge as a "recoupment fee" or a "user fee."
Count II alleges a facially sufficient claim for injunctive and declaratory relief, and thus the circuit court could not have granted the judgment on this count for failure to state a claim. Further, the record contains disputed issues of material fact precluding summary judgment on this count.
Both sides filed lengthy affidavits that are factually complex regarding the need for this capacity fee, the calculation of this fee, the anticipated revenue from the fee, and the County's understanding of where that revenue can or will be spent. Although *675 the record does not conclusively establish how this impact fee was calculated and the intentions regarding the specific allocation of any revenues received from the fee, the parties have presented general arguments regarding the proper calculation of the fee or the proper use of revenue collected from the fee.
SOSS argues that the capacity fee cannot be used to pay off any existing County debt or to pay for expansion other than in an amount that directly and strictly relates to the impact of these new users. The County, however, points out that modern financing requires the payment of existing debt to permit further expansion. The County notes that other states have expressly recognized that impact fees can be used to pay the debts incurred in building capacity for the future. See, e.g., Airwick Indus., Inc. v. Carlstadt Sewerage Auth., 57 N.J. 107, 270 A.2d 18 (1970). In addition, the County argues that concurrency now requires that an expansion of the sewer system must include a provision for excess capacity to ensure the efficient use of capital and to ensure that the County can accommodate new growth as it occurs.
Given the concurrency requirements now in place and the modern requirements for financing capital expansion as discussed above, we are inclined to reject SOSS's arguments that the revenues from an impact fee can never be used to pay existing indebtedness or that the amount of the impact fee cannot be based in part upon a recognized need for future capacity. Nevertheless, the supreme court's distinction between the proper use of impact fees to finance reasonably anticipated costs of expansion versus the prohibited use of such fees to pay for the existing system as a whole remains in place. See Contractors & Builders Ass'n, 329 So.2d at 320-21; St. Johns County, 583 So.2d 635, 637-39; Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 134-36 (Fla. 2000).
This distinction requires the circuit court to carefully review the calculation of the impact fee and the intended expenditures from the revenue generated by that fee to assess whether the fee meets the dual rational nexus test. That is, the circuit court must assess whether the County has met its burden of demonstrating a reasonable connection or rational nexus between the need for additional capital facilities because of the anticipated new users of the system who will pay this fee, and a reasonable connection or rational nexus between the intended expenditures of the collected funds and benefits accruing to those new users. See Aberdeen at Ormond Beach, L.P., 760 So.2d at 134.[2] Because disputed issues of material fact remain in this record as to the calculation of the fee and the intended use of the revenues from the fee, summary judgment on this count was improper.

COUNT III. THE ADDITIONAL SURCHARGE
As explained earlier, count III alleged that the County was planning to impose a surcharge and asked the court to enter a declaratory judgment barring such an ordinance. The County moved to dismiss or for summary judgment exclusively *676 on the theory that the complaint was premature until the surcharge was calculated and imposed. It argued that SOSS had no right to seek judicial relief unless and until the County passed an ordinance.
After the amended complaint and the County's motion were filed, the County apparently enacted Resolution No. 2003-285, which is described in the record as imposing a $165 per year surcharge. The County discussed this resolution at the hearing on its motion to dismiss and argued that it was legal and proper. SOSS argued that many factual issues remained and that a hearing on the surcharge was required. The trial court entered an order that granted the motion without further explanation.
Our difficulty, of course, is that count III does not specifically challenge the subsequently enacted Resolution No. 2003-285, and the County's basis for requesting summary judgment did not involve the propriety of that resolution. Even if the grounds contained in the County's motion had merit, an order dismissing the amended complaint because it challenged only a possible future resolution should have resulted in an order allowing SOSS to file an amended complaint challenging Resolution 2003-285. We thus reverse the order dismissing count III in order to give SOSS the opportunity to amend its complaint to make specific legal challenges to the contents of Resolution 2003-285.
Reversed and remanded for further proceedings.
SALCINES and STRINGER, JJ., Concur.
NOTES
[1] Section 163.3180 was enacted in 1993. See ch. 93-206, § 8, Laws of Fla.
[2] This test appears to afford some deference to the local legislative body by relying on terms like "reasonable" and "rational," although the application of the standard in the various cases suggests something more stringent than a "rational basis"-type review. Although the issue has not yet been raised, this deference might also limit the remedies available to SOSS if the impact fee calculated by the County is deemed unreasonable. Cf. Gargano v. Lee County Bd. of County Comm'rs, 921 So.2d 661, 668 (Fla. 2d DCA 2006) (citing Miami Bridge Co. v. Miami Beach Ry. Co., 152 Fla. 458, 12 So.2d 438, 445-46 (1943)).