Dear Mr. Groot:
On behalf of the City of Sanford Commission, you ask substantially the following question:
May the City of Sanford's Community Redevelopment Agency expend funds for festivals or street parties designed to promote tourism and economic development, advertisements for such events, grants to entities which promote tourism and economic development, and grants to non-profit entities providing socially beneficial programs?
In sum:
Promoting the use of a redeveloped area would appear to fall within the purposes of the community redevelopment act. Use of community redevelopment funds to pay entities promoting tourism or providing socially beneficial programs, however, does not have an apparent nexus to carrying out the purposes of the community redevelopment act.
You state that the City of Sanford has implemented the provisions of the Community Redevelopment Act of 1969, Part III, Chapter 163, Florida Statutes, in creating the City of Sanford Community Redevelopment Agency (SCRA). The SCRA proposes to use funds to stage festivals or street parties to promote tourism and economic development, to provide grants to entities that encourage tourism and economic development, and to provide grants to non-profit entities which provide a wide range of socially beneficial programs. The question has arisen, however, whether such expenditures may be paid by the SCRA.
Pursuant to the act, a local government may determine that an area is a slum or is blighted and designate such area as appropriate for community redevelopment.[1] The Legislature has declared that slum and blighted areas constitute a serious and growing menace to the public health, safety, morals, and welfare of the residents of the state.[2] To address this matter, local governments, upon adoption of a resolution based upon legislative findings that the conditions in an area meet specified criteria described in the act, may create a community redevelopment agency.[3] The agency's purpose is to carry out community redevelopment purposes set forth in the act.[4]
"Community redevelopment" or "redevelopment" is defined in the act as:
undertakings, activities, or projects of a county, municipality, or community redevelopment agency in a community redevelopment area for the elimination and prevention of the development or spread of slums and blight, or for the reduction or prevention of crime, or for the provision of affordable housing, whether for rent or for sale, to residents of low or moderate income, including the elderly, and may include slum clearance and redevelopment in a community redevelopment area or rehabilitation and revitalization of coastal resort and tourist areas that are deteriorating and economically distressed, or rehabilitation or conservation in a community redevelopment area, or any combination or part thereof, in accordance with a community redevelopment plan and may include the preparation of such a plan."[5]
Among the powers granted by the act to carry out community redevelopment are: to make contracts; to disseminate slum clearance and community redevelopment information; to undertake community redevelopment and related activities;[6] to furnish or repair streets, public utilities, playgrounds, and other public improvements; to hold or dispose of property for redevelopment.[7]
Section 163.387, Florida Statutes, establishes a redevelopment trust fund for each community redevelopment agency created pursuant to section 163.356, Florida Statutes, and provides for its annual funding. Pursuant to subsection (1) of the statute, funds allocated to and deposited into the fund shall be used by a community redevelopment agency "to finance or refinance any community redevelopment it undertakes pursuant to the approved community redevelopment plan."
The expenditure of moneys in the redevelopment trust fund is specifically authorized by section 163.387(6), Florida Statutes, "for undertakings of a community redevelopment agency as described in the community redevelopment plan," including, but not limited to:
"(a) Administrative and overhead expenses necessary or incidental to the implementation of a community redevelopment plan adopted by the agency.
(b) Expenses of redevelopment planning, surveys, and financial analysis, including the reimbursement of the governing body or the community redevelopment agency for such expenses incurred before the redevelopment plan was approved and adopted.
(c) The acquisition of real property in the redevelopment area.
(d) The clearance and preparation of any redevelopment area for redevelopment and relocation of site occupants within or outside the community redevelopment area as provided in s. 163.370.
(e) The repayment of principal and interest or any redemption premium for loans, advances, bonds, bond anticipation notes, and any other form of indebtedness.
(f) All expenses incidental to or connected with the issuance, sale, redemption, retirement, or purchase of bonds, bond anticipation notes, or other form of indebtedness, including funding of any reserve, redemption, or other fund or account provided for in the ordinance or resolution authorizing such bonds, notes, or other form of indebtedness.
(g) The development of affordable housing within the community redevelopment area.
(h) The development of community policing innovations."
While the statute specifically states that the use of community redevelopment trust funds is not limited to those purposes enumerated therein, the community redevelopment agency is a statutorily created administrative agency that may only exercise those powers that have been expressly granted by statute or that are necessarily exercised in order to carry out an express power.[8]
Any reasonable doubt as to the lawful existence of a particular power sought to be exercised must be resolved against the exercise thereof.[9] Moreover, it is well settled that legislative intent is the polestar that guides a court's statutory construction analysis[10] and would, therefore, limit the expenditures by the community redevelopment agency. I would note that the Redevelopment Plan and Finding of Necessity for the Lake Monroe Waterfront and Downtown Sanford Redevelopment Area[11] contains a "Promotional Marketing" component, recognizing the importance of funding for events, advertising and marketing to bring people to the redevelopment area. The plan notes that the SCRA budget is subject to approval by the City of Sanford. Therefore, ultimately, it is a decision for the governing body of the City of Sanford to determine whether promotional expenditures may be included in the SCRA budget. Although a city has home rule powers, in matters involving the imposition of a tax and the expenditure of the proceeds from such a tax, the city must be able to point to statutory or constitutional authority.[12] The courts of this state have recognized the general rule that tax revenues must be expended for the purposes for which they were collected, that is, funds raised by taxation for one purpose cannot be diverted to another use.[13] In addition, this office has stated, for example, that moneys collected pursuant to the original ordinance imposing a tourist development tax could only be used to accomplish the purposes set forth in the original plan for tourist development and could not be expended for the purposes set forth in the new ordinance or considered in a new tourist development plan.[14]
As discussed above, it would appear that the primary focus of a community redevelopment agency is to eliminate and prevent the development or spread of slums and blight. This may be accomplished by reducing or preventing crime, by providing affordable housing, clearing slums and redeveloping in a community redevelopment area, or by rehabilitating or conserving in a community redevelopment area, or any combination or part thereof. The enumerated uses of community redevelopment trust fund moneys are likewise couched in terms of redevelopment activities involving "bricks and mortar" in a manner of speaking, rather than promotional campaigns to encourage people to populate the area once the redevelopment has been accomplished. However, to read the statute as precluding the promotion of a redeveloped area once the infrastructure has been completed would be narrowly viewing community redevelopment as a static process.
Accordingly, I cannot say that the use of community redevelopment funds would be so limited that the expenditure of funds for the promotion of a redeveloped area would be prohibited. However, grants to entities which promote tourism and economic development, as well as to nonprofits providing socially beneficial programs would appear outside the scope of the community redevelopment act.
Sincerely,
Bill McCollum Attorney General
BM/tals
[1] See s. 163.358, Fla. Stat.
[2] Section 163.335(1), Fla. Stat.
[3] Section 163.355, Fla. Stat. Subsections 163.340(7) and (8), Fla. Stat., provide definitions for "[s]lum area" and for "[b]lighted area" for purposes of the act:
"(7) `Slum area' means an area having physical or economic conditions conducive to disease, infant mortality, juvenile delinquency, poverty, or crime because there is a predominance of buildings or improvements . . . which are impaired by reason of dilapidation, deterioration, age, or obsolescence, and exhibiting one or more of the following factors:
(a) Inadequate provision for ventilation, light, air, sanitation, or open spaces;
(b) High density of population, compared to the population density of adjacent areas within the county or municipality; and overcrowding, as indicated by government-maintained statistics or other studies and the requirements of the Florida Building Code; or
(c) The existence of conditions that endanger life or property by fire or other causes.
(8) `Blighted area' means an area in which there are a substantial number of deteriorated, or deteriorating structures, in which conditions, as indicated by government-maintained statistics or other studies, are leading to economic distress or endanger life or property, and in which two or more of the following factors are present:
(a) Predominance of defective or inadequate street layout, parking facilities, roadways, bridges, or public transportation facilities;
(b) Aggregate assessed values of real property in the area for ad valorem tax purposes have failed to show any appreciable increase over the 5 years prior to the finding of such conditions;
(c) Faulty lot layout in relation to size, adequacy, accessibility, or usefulness;(d) Unsanitary or unsafe conditions;
(e) Deterioration of site or other improvements;
(f) Inadequate and outdated building density patterns;
(g) Falling lease rates per square foot of office, commercial, or industrial space compared to the remainder of the county or municipality;
(h) Tax or special assessment delinquency exceeding the fair value of the land;
(i) Residential and commercial vacancy rates higher in the area than in the remainder of the county or municipality;
(j) Incidence of crime in the area higher than in the remainder of the county or municipality;
(k) Fire and emergency medical service calls to the area proportionately higher than in the remainder of the county or municipality;
(l) A greater number of violations of the Florida Building Code in the area than the number of violations recorded in the remainder of the county or municipality;
(m) Diversity of ownership or defective or unusual conditions of title which prevent the free alienability of land within the deteriorated or hazardous area; or
(n) Governmentally owned property with adverse environmental conditions caused by a public or private entity.
However, the term `blighted area' also means any area in which at least one of the factors identified in paragraphs (a) through (n) are present and all taxing authorities subject to s. 163.387(2)(a) agree, either by interlocal agreement or agreements with the agency or by resolution, that the area is blighted. Such agreement or resolution shall only determine that the area is blighted. For purposes of qualifying for the tax credits authorized in chapter 220, `blighted area' means an area as defined in this subsection."
[4] Section 163.356(1), Fla. Stat.
[5] Section 163.340(9), Fla. Stat.
[6] Section 163.340(12), Fla. Stat., defines "[r]elated activities" as: planning work for the preparation of a general neighborhood redevelopment plan or for the preparation or completion of a communitywide plan or program pursuant to s. 163.365, Fla. Stat.; functions related to the acquisition and disposal of real property; development of affordable housing for residents of a redevelopment area; and the development of community policing innovations.
[7] See s. 163.370, Fla. Stat., which contains numerous other powers, none of which specifically include programs which would encompass a street festival or party to promote tourism or community redevelopment.
[8] See, e.g., Gardinier, Inc. v. Florida Department ofPollution Control, 300 So. 2d 75, 76 (Fla. 1st DCA 1974);Williams v. Florida Real Estate Commission,232 So. 2d 239, 240 (Fla. 4th DCA 1970).
[9] See Halifax Drainage District of Volusia County v.State, 185 So. 123, 129 (Fla. 1938); State ex rel. Greenberg v.Florida State Board of Dentistry,297 So. 2d 628 (Fla. 1st DCA 1974), cert. dismissed,300 So. 2d 900 (Fla. 1974); City of Cape Coral v. GACUtilities, Inc., of Florida, 281 So. 2d 493 (Fla. 1973).And see, e.g., Ops. Att'y Gen. Fla. 02-30 (2002) and 04-48 (2004).
[10] See State v. Rife, 789 So. 2d 288, 292 (Fla. 2001);McLaughlin v. State, 721 So. 2d 1170, 1172 (Fla. 1998).
[11] Originally drafted November 21, 1995; Last updated July 29, 2009.
[12] See generally Contractors and Builders Association ofPinellas County v. City of Dunedin,329 So. 2d 314, 317 (Fla. 1976). See also City of Tampa v.Birdsong Motors, Inc., 261 So. 2d 1 (Fla. 1972) (municipality's power to tax is subject to the restrictions in Art. VII, s. 9, Fla. Const.).
[13] See Supreme Forest Woodmen Circle v. Hobe SoundCompany, 138 Fla. 141, 189 So. 249 (1939); Dickinson v.Stone, 251 So. 2d 268, 273-274 (Fla. 1971) (it is a violation of an elemental principle in the administration of public funds for one who is charged with the trust of their proper expenditure not to apply those funds to the purposes for which they are raised).And see Oven v. Ausley, 106 Fla. 455, 143 So. 588 (1932);Taylor v. Williams, 142 Fla. 756, 196 So. 214 (Fla. 1940).
[14] See Op. Att'y Gen. Fla. 96-26 (1996). And see
Ops. Att'y Gen. Fla. 86-39 (1986), 82-54 (1982), and 77-26 (1977).